CELLA et al. v. BROWN et al.

(Circuit Court of Appeals, Eighth Circuit. March 8, 1906. On Rehearing, May 7, 1906.)

No. 2,299.

1. PLEADING—ALLEGATION OF FRAUD.
A mere allegation in a bill of complaint that the plan of reorganization between two street railway companies was fraudulently designed, without specifically charging that said companies participated therein, or specifying in what the fraud consisted, is a mere brutum fulmen. It presents no issuable fact, as it is a mere conclusion of the pleader.

[Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Fraud, § 37; vol. 39, Cent. Dig. Pleading, § 28½.]

2. REMOVAL OF CAUSES.
Where the bill in equity instituted in the state court on its face states no ground of equitable relief against two defendant corporations, citizens of the same state as that of the complainants, such defendants should be eliminated from the case in determining the right of removal by a nonresident defendant in such action.

[Ed. Note.—For cases in point, see vol. 42, Cent. Dig. Removal of Causes, § 71.]

3. EQUITY—PRAYER FOR ALTERNATIVE RELIEF.
While the pleader, in the instance where he is uncertain as to what specific relief he is entitled, may so frame his bill as to entitle him to an alternative prayer for relief; yet he may not be so entitled where the bill clearly discloses the fact that he seeks relief based upon the recognition of the validity of a transaction which he seeks to specifically enforce, and at the same time pray for the annulment of such transaction as fraudulent.

**4. SPECIFIC PERFORMANCE—PARTIES TO SUITS FOR SPECIFIC PERFORMANCE.**

The parties to the contract, as a general rule, are the only proper parties to a suit for its performance, except in case of an assignment of the entire contract, or there are some special circumstances authorizing a departure from the rule.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Specific Performance, §§ 342-351.]

**5. REMOVAL OF CAUSES—SEPARABILITY OF SUIT FOR PURPOSE OF REMOVAL.**

Where the bill seeks specific performance of an alleged contract between the complainants and the nonresident citizen defendant, claiming that under the contract the complainants are entitled to an allotment of an aliquot proportion of a large mass of bonds and securities, controlled by such nonresident defendant, against whom a decree for such allotment would apparently afford the complainants complete relief, a third party defendant, a citizen of the same state as complainants, to whom the nonresident defendant has made an allotment of like apportionment without complainant's consent, is not such a necessary party defendant as to disentitle the nonresident defendant to remove the controversy into the United States Circuit Court.

[Ed. Note.—Separable controversy as ground for removal of cause to federal court, see notes to Robbins v. Ellenbogen, 18 C. C. A. 86; Mecke v. Valleytown Mineral Co., 35 C. C. A. 155.]

**6. SPECIFIC PERFORMANCE.**

The remedy by specific performance, lying within the domain of judicial discretion not arbitrarily exercised, may be refused whenever there is any uncertainty or doubt about the terms of the proposed contract, or a well-founded conviction that its specific enforcement, under the facts and circumstances of the case, would be harsh and unreasonable, or more hurtful to the rights of others in interest than its denial to the suitor.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Specific Performance, §§ 17, 18, 34, 35.]

**7. SAME—MERITS OF THE CASE STATED.**

Where two street railway companies, to prevent financial disaster, enter into a tripartite agreement with designated Syndicate Managers for a plan of reorganization, whereby such managers were to control, for a given period, and sell participating interests in certain bonds and securities hypothecated as collaterals to secure a contract between the two street railway companies, to raise the necessary funds to meet pressing, maturing obligations of the pledgor company, providing for a specific time of control by and compensation to such Syndicate Managers, who, in order to raise an immediate fund of $7,000,000, submitted to the complainants as shareholders in the pledgor company a proposition to allot to them an aliquot portion of such bonds and securities on the payment to a designated agent of the Syndicate Managers of the purchase price, such interest in the purchaser to be evidenced by a participating receipt to be delivered to him by such agent, which proposition the complainants accepted, and, when they made tender of the designated purchase price, refused to execute the agreement, evidencing the right of the Syndicate Managers to hold and manage the securities for the designated period and compensation for their services, which was left by the Syndicate Managers with such agent to be signed by the purchasers before delivering to them the participating receipt evidencing such allotment. *Held* that, it appearing from the evidence that the complainants had participated in the meeting of the stockholders of said railroads providing for such reorganization, and that they had notice before the submission of said proposition to them of the terms of said agreement submitted for their signature, their refusal to so execute the same was a departure from the syndicate proposal of sale and disentitled the complainants to a specific performance.

**8. TRUSTS—EXPRESS AND IMPLIED TRUST.**

If the settlor, even without a valuable consideration, makes an explicit declaration of trust duly executed, with the intention of it being obligatory

upon him, equity will enforce such trust. But, if it be a mere agreement without consideration to execute an agreement declaratory of a trust, the court will not enforce it, and no trust relation arises where there is a mere promise to execute an agreement when the promise is conditioned upon the promisee executing on his part a collateral obligation which he refuses to do. In such case no implied trust arises, for the reason that the vendees did not accept the proposition on the conditions submitted by the vendors.

(Syllabus by the Court.)

On Motion for Rehearing.

9. REMOVAL OF CAUSES—RECORD—SUBSEQUENT PLEADINGS.
The right to remove a suit in equity must be determined on the allegations of the bill as filed in the state court, and neither the allegations of a bill of repleader filed in the federal court after removal nor of the answer can be considered.
[Ed. Note.—For cases in point, see vol. 42, Cent. Dig. Removal of Causes, §§ 58, 59.]

10. COURTS—CIRCUIT COURT OF APPEALS—CERTIFICATION OF QUESTION TO SUPREME COURT.
The certification of a question of law by a Circuit Court of Appeals to the supreme court under Act March 3, 1891, c. 517, § 6, 26 Stat. 828 [U. S. Comp. St. 1901, p. 549], is a matter resting in the discretion of the court, the exercise of which cannot be invoked by a party as a matter of right. Such certification should not be made, except in cases of grave doubt, and not after the case has been decided by the Circuit Court of Appeals.
[Ed. Note.—For cases in point, see vol. 13, Cent. Dig. Courts, § 1021.]

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

See 136 Fed. 439.

The United Railways Company of St. Louis (hereinafter styled "the Railways Company"), the owner of a system of railways in the city of St. Louis, on September 30, 1899, made a contract of lease with the defendant the St. Louis Transit Company (hereinafter styled "the Transit Company") to extend, improve, and operate said street railways for a period of 40 years. Acting under the covenants made in said lease the transit company became largely indebted, beyond its ability to promptly meet and continue to be "a going concern." To meet this financial situation, on the 1st day of November, 1901, the transit company authorized an issue of its three-year five per cent. collateral trust notes, amounting to $6,000,000, to secure which it pledged with the Mercantile Trust Company of St. Louis stocks and bonds owned by it as follows: $2,877,000 four per cent. general mortgage bonds of the railways company, and $4,893,500 five per cent. preferred stock of the railways company. Of the authorized issue of the collateral trust notes, $5,776,000 were sold, maturing November 1, 1904. On June 17, 1903, the transit company, becoming further indebted and pressed for funds, authorized the issue of $20,000,000 20-year 5 per cent. gold improvement bonds, to be secured by the collaterals theretofore pledged with the Mercantile Trust Company, and by 33,297 shares of preferred stock and 172,613 shares of the common stock of the railways company, and mortgage executed by the transit company on its leasehold interests in said property, as also by the guaranty of the railways company. Being unable, however, to sell or dispose of this last-named issue of bonds or make other provision for the payment of its collateral trust notes maturing November 1, 1904, and its other indebtedness, the two railway companies and their stockholders were under the imperious necessity of adopting some plan to prevent the bankruptcy of the company.

The result of their convention was that what is known in this controversy as a "Tripartite Agreement" was entered into on the 27th day of September, 1904, between the transit company, the railways company, and Brown Bros. &

Co., a copartnership resident of the city of New York, as Syndicate Managers; which, after reciting the indebtedness and collateral trust securities aforesaid, and the fact that the transit company had a further specific floating indebtedness of about $935,000, which it was unable to meet except by the sale of the collaterals deposited with the Mercantile Trust Company, and which it was unable to dispose of without procuring a release thereof from said pledges and the right of substitution which the railways company had by reason of the terms of its guaranty, it declared that the transit company proposed to make an issue of 5 per cent. 20-year gold bonds to be called improvement bonds, in the aggregate amount of $10,000,000, and obtain the guaranty of the railways company thereon, secured by a mortgage of the railway company upon all of its property. The agreement then stipulated as follows:

"First. Transit company agrees, whenever requested by the railways company so to do, that it will surrender to railways company, by proper instruments or conveyance of release, all and singular the property demised by the aforesaid lease of September 30th, 1899, and deliver, assign and transfer to railways company, upon such request, the immediate possession of all the said demised property, and all cash, bills receivable or other credits then owned or held by it, for and upon the considerations and conditions hereinafter named. Provided, only that railways company, at the time of said request, shall release and fully acquit transit company from all liability which then has or may thereafter accrue to railways company under or by virtue of any of the terms or covenants of said lease.

"Second. Transit company further agrees that it will cause the eight million dollars ($8,000,000.00) now outstanding of its refunding and improvements bonds, together with all the unissued bonds of the total authorized issue of twenty million dollars ($20,000,000.00) of its said refunding and improvement bonds, to be canceled and the indenture of trust of June 17th, 1903, to be released and discharged. That it will cause the holders of the eight million dollars ($8,000,000.00) of outstanding refunding and improvement bonds to agree to exchange the same at par for like amount at par of its proposed improvement bonds, to be guaranteed, as hereinbefore stated, by railways company.

"Third. That it will enter into an agreement, as hereinafter stated, with Syndicate, for the sale of all of the bonds and stocks deposited with the Mercantile Trust Company under the collateral trust agreement of November 30th, 1901, and the indenture of trust of June 17th, 1903, together with the two million dollars ($2,000,000.00) of the proposed improvement bonds, which remain after the exchange of $8,000,000.00 thereof for the $8,000,000.00 of the outstanding refunding and improvement bonds. That in and by such sale to Syndicate as hereinafter stated, transit company shall provide that seven million dollars ($7,000,000.00) of preferred stock of railways company shall be deposited for the use and benefit of railways company, upon terms and subject to restrictions to be agreed upon herein between railways company and Syndicate.

"Fourth. Railways company agrees, subject to the approval of the legal majority of its stockholders, to guarantee said proposed issue of ten million dollars ($10,000,000.00) of Improvement Bonds, and to secure its said guarantee thereof by a deed of trust or mortgage upon all of its property, subject only to the mortgage liens already existing thereon.

"Article II.

"First. Transit company agrees with Syndicate as follows: To sell, assign and transfer to Syndicate two million dollars ($2,000,000.00) of its said proposed improvement bonds at eighty-five cents (85 cts.) on the dollar (or $1,700,000.00), and eight million, two hundred and twenty-seven thousand, three hundred dollars ($8,227,300.00) par value of the preferred stock of the United Railways Company of St. Louis, and two million, eight hundred and seventy-seven thousand dollars ($2,877,000.00) par value of the 4 per cent. general mortgage bonds of the United Railways Company of St. Louis, and seventeen million, two hundred and sixty-one thousand, three hundred dollars ($17,261,300.00) par value of the common stock of the United Railways Com-

pany of St. Louis, for and in consideration of the sum of five million three hundred thousand dollars ($5,300,000.00), aggregating the sum of seven million dollars ($7,000,000.00), of which sum six million, seven hundred and eleven thousand dollars ($6,711,000.00) shall be paid at the time, upon the terms and conditions, and for the uses and purposes specified in a contract between the Mercantile Trust Company, as Syndicate Manager and as trustee, and transit company, bearing date September 9th, 1904. The remainder, viz., two hundred and eighty-nine thousand dollars ($289,000.00) shall be paid upon the order of transit company or its president.

"Second. Syndicate agrees to pay for said bonds and stocks the amounts so specified, at the dates and upon the terms and conditions specified in the next preceding paragraph.

"Syndicate further agrees to cause seven million dollars ($7,000,000.00) of the preferred stock of railways company, so to be acquired by it, to be deposited with a trustee, for the use and benefit of United Railways Company, upon the terms and covenants hereinafter made between Syndicate and railways company.

"Article III.

"Railways company and Syndicate agree as follows:

"(a) Railways company has in its treasury, unappropriated and unissued, shares of common stock of the par value of seven million, six hundred and fifty-two thousand five hundred dollars ($7,652,500.00). In consideration of the purchase by Syndicate of the stocks and bonds as herein agreed upon between transit company and Syndicate and the agreement to deposit with the National Bank of Commerce in St. Louis, as trustee for the use and benefit of railways company preferred shares of stock of railways company aggregating the total par value of seven million dollars ($7,000,000.00) and the agreement of Syndicate to offer to ·procure for railways company, as hereinafter stated, shares of stock of the transit company, railways company hereby agrees to sell for the consideration aforesaid and other considerations herein mentioned, and to issue to Syndicate the said shares of common stock of railways company, aggregating the par value of seven million, six hundred and fifty-two thousand, and five hundred dollars ($7,652,500.00). And

"(b) Railways company further agrees, whenever thereto requested by Syndicate, to demand of transit company the surrender of the leasehold and the demised property leased to it under an indenture of lease dated September 30th, 1899, as hereinbefore agreed between railways company and transit company, and immediately upon such surrender, as therein provided, to enter into and upon the premises and the operation of said property, and, coincident therewith as between it and transit company, to assume the payment of the ten million dollars ($10,000,000.00) of proposed improvement bonds guarantied, as herein provided by railways company, and all debts then contracted for labor, materials or supplies rendered or furnished to transit company.

"(c) Syndicate agrees that it will purchase, upon the terms and conditions hereinbefore stated in article II, the bonds and stocks therein agreed to be sold and purchased, and, immediately upon coming into possession thereof, it will deposit with the National Bank of Commerce in St. Louis, trustee, preferred stock of railways company, of the aggregate par value of seven million dollars ($7,000,000.00) so purchased for the use and benefit of railways company; which stock, or any part thereof, so deposited with said trustee shall be sold for the use and benefit of railways company by said trustee, whenever requested by railways company, at such price and upon such terms as railways company may direct.

"(d) Syndicate further agrees that the common stock of railways so purchased as aforesaid from railways company, it will offer to the shareholders of transit company, until the 18th day of October, 1904, voting trust certificates, issued under and by virtue of such a voting trust agreement as Syndicate may organize and make, representing two (2) shares of the said common stock for five (5) shares of the transit company stock, provided said shareholders of transit company shall deposit their stock under terms and conditions prescribed by Syndicate for the purpose of such exchange, and, upon the basis aforesaid, with the National Bank of Commerce, in St. Louis, as agent

of Syndicate, on or before said 18th day of October, 1904; and such transit shares as shall be so exchanged shall be and become the property of railways company and be transferred to its treasury. All shares of railways company's common stock not so exchanged for transit stock within said period shall be and remain thereafter the property of Syndicate. Syndicate, however, of its own volition, but without any obligation to do so, may thereafter continue to exchange said stock upon said basis, and, should it do so, whatever shares of transit company stock Syndicate acquires by such exchange shall become the property of railways company.

### "Article IV.

"The covenants between the respective parties hereto shall not be construed as inuring to the benefit or advantage of any person or corporation whose name is not subscribed to this agreement as a party thereto, and this agreement is conditioned upon the authorization by the shareholders of transit company of an issue of bonds aggregating ten million dollars ($10,000,000.00) at a meeting of the shareholders of said company called for October 19th, 1904, and the authority of the shareholders of the United Railways Company to guaranty the said issue of bonds of transit company, and to make a mortgage to secure said guaranty, at a meeting called for the 20th of October, 1904."

On the same day Brown Bros. & Co., as Syndicate Managers, addressed a circular letter to the shareholders of the transit company, which is as follows:

"Conditioned upon the execution and accomplishment of a tripartite contract between the St. Louis Transit Company, the United Railways Company of St. Louis, and a Syndicate, of which the undersigned are managers, and in accordance with the terms of a covenant therein contained between the United Railways Company of St. Louis and the undersigned, as said Syndicate Managers:

"First. The undersigned do hereby appoint the National Bank of Commerce in St. Louis as their agent, for and in their behalf, to accept and receive the deposit of the shares of stock of the St. Louis Transit Company, subject to the terms of this proposal, and to issue interim receipts therefor, and to receive applications, as hereinafter stated, for participation in said Syndicate.

"The transit company's stock and applications for participation will be received by Messrs. Brown Bros. & Co. at their offices in New York, Philadelphia and Boston, for transmission, without expense to the depositor, to the National Bank of Commerce in St. Louis.)

"Second. The shares of the stock of the St. Louis Transit Company so deposited must be indorsed in blank under a power of attorney authorizing the transfer of same upon the books of the company, and so deposited with said bank on or before the 18th day of October, 1904; and the deposit must also be accompanied with the inclosed proxy, duly executed.

"Third. Upon and subject to the conditions hereinbefore stated, the undersigned, as Syndicate Managers, will exchange with the owner, or his assigns, of the stock so deposited, two shares of the common stock of the United Railways Company of St. Louis for each five shares of the stock of the St. Louis Transit Company; the said United Railways Company's stock, however, to be represented by voting trust certificates issued under a voting trust agreement to be formed and made by the undersigned, with such terms and conditions as may seem wise to them, as managers, and shall endure for a period of five years from and after November 1st, 1904, unless sooner dissolved pursuant to the terms of such trust agreement.

"Fourth. The Syndicate, of which the undersigned are managers, has been organized to purchase certain bonds and stocks mentioned in said tripartite agreement, belonging to the St. Louis Transit Company, and upon a plan and terms heretofore agreed between Syndicate and managers, after the consummation of which there will remain in the possession of managers, as the property of the underwriters:

$2,000,000.00 5 per cent. improvement bonds at 85..........$1,700,000 00
$2,877,000.00 first general mortgage 4 per cent. bonds of the
   United Railways Company; 12,273 shares of the preferred
   stock of the United Railways Company ...............:..$5,300,000 00
165,092.80 shares of the common stock of the United Railways
   Company, at a total cost of .........................$7,000,000 00

"It is the desire of the Syndicate Managers to afford such of the share-holders of the St. Louis Transit Company as shall deposit their stock, as hereinbefore provided, an opportunity to participate in such purchase of said bonds and stocks under the said Syndicate plan. This offer is, however, en-tirely without any consideration, and purely voluntary on the part of managers and Syndicate.

"The application of all such stockholders of transit company as, on or before Friday, October 7th, 1904, shall be made in accordance with the subjoined communication to the National Bank of Commerce in St. Louis, as agent for Syndicate Managers, for participation in said Syndicate purchase, will have the attentive consideration of managers, and allotment upon such applica-tions will be made as soon thereafter as practicable; but managers may re-quire any such applicant to give a guaranty of his financial responsibility, or security for the full amount of his application, and reserves the right to allot a lesser amount than that applied for."

On September 29, 1904, complainants addressed the following communication to said National Bank of Commerce: "The undersigned, owner and holder of 11,000 shares of the capital stock of the St. Louis Transit Company, being all of his holdings, having deposited said shares with you under the proposal of said Syndicate Managers, under date of September 27, 1904, does hereby re-quest participation in said Syndicate to the amount of $1,000,000, and does hereby agree to pay the whole or any part thereof in cash or in St. Louis Transit Company 5 per cent. collateral trust notes, due November 1, 1904, at par and interest, as and when requested so to do by managers, either by letter deposited in the post office, prepaid, or telegram delivered to a telegraph com-pany, addressed to the undersigned at the following place, No. 200 N. 4th St., St. Louis, Mo., in exchange for Syndicate receipt in negotiable form; and I do hereby authorize you, for me and in my name, to subscribe to any plan or syndicate agreement that may be written and approved by said Syndicate Managers, to the full extent of the amount of syndicate subscription hereby applied for."

On October 11, 1904, Brown Brothers & Co. addressed to the shareholders of the transit company the following letter: "Upon the terms and conditions of our letter to you of September 27, 1904, and of the application which accompa-nied the same, we make you this supplemental proposition which must be ac-cepted on or before the 17th day of October, 1904. If not accepted on or be-fore the said date it will neither be continued nor renewed. We have de-termined to allow each shareholder of the St. Louis Transit Company, in the proportion which the number of his shares of stock in said company bears to the total amount of shares outstanding to participate in the syndicate pur-chase to be controlled by the Syndicate Managers. To each shareholder who shall subscribe in the way hereinafter provided for his proportion of said syndicate purchase on or before the time designated we will allot such pro-portion. Of course, any application heretofore made by any such stockholder will be treated as merged in any application which he will make under this proposal. If he makes no application hereunder, his prior application will stand. The signed application of all stockholders of transit company for this participation must, within the time designated, be made and deposited in ac-cordance with the subjoined communication to and with the National Bank of Commerce of St. Louis, as agent for Syndicate Managers, Allotments in ac-cordance with such applications will be made as soon thereafter as practicable; but managers require that any such applicant, in connection with his application and as a necessary part thereof, shall simultaneously give a guaranty of his financial responsibility, or security for the full amount of his application. Such guaranty or security must be satisfactory to said bank, whose decision shall be final, and if the bank shall not be satisfied in such particulars within

the time designated. the application shall be treated as if it had not been made."

On October 20, 1904, Brown Bros. & Co. addressed to the complainants the following communication: "Referring to our letter of September 27th, 1904, and to our supplementary notice of October 11th, 1904, addressed to the shareholders of the St. Louis Transit Company, and also to your formal application through the National Bank of Commerce in St. Louis as our agents for $1,-000,000, underwriting in this Syndicate, we have allotted you, in accordance with the terms of our offer of October 11, 1904, a participation of $446,160, being 40.56 per cent. of the par value of your holdings in St. Louis Transit Company Stock"—adding a call for the payment of 84 per cent.

On the 10th day of October, 1904, an agreement was drawn up as contemplated by the tripartite agreement for the purchase of the bonds of the transit company and the railways company, which is the principal bone of contention between these parties. So much of this agreement as is pertinent to the questions here involved is substantially as follows: It was designated as "The agreement between Brown Bros. & Co. as Syndicate Managers and the subscribers." It referred to the tripartite agreement on the 27th of September, 1904, and its purposes, and the plan which was understood and anticipated, with a recitation as to what stocks and securities the syndicate was to receive, and the terms, the estimated amount of which was $7,000,000. By this agreement the subscribers agreed with each other and the syndicate management that they would, from time to time, on calls made by said managers, pay to them such sums in cash and 5 per cent. notes of the transit company, due November 1, 1904, at par, with interest, in the aggregate not exceeding their respective subscriptions thereunder.

The second section declared that the subscribers form a syndicate for the purpose of performing and carrying out said tripartite agreement. Each subscriber should indicate opposite his name the total sum of his subscription on account of the whole syndicate obligation; they were to make payments under the several subscriptions ratably according to the respective amounts thereof; that nothing therein contained should constitute the parties partners or render any one of the subscribers liable to contribute more than his several proportionate amount as provided, or should prevent any of the parties from contracting with each other with reference to any of their respective interests.

Paragraph 3 provided that, in case of the failure of any subscriber to respond to any call for the payment or to perform any of his undertakings, the Syndicate Managers might exclude such subscriber from all interest in the syndicate, and might dispose of such subscriber's participation hereunder of any interest or right under said proposed contract, but should be responsible to the Syndicate Management for the benefit of the other subscribers for all damages caused by any such default.

Paragraph 4 authorized the Syndicate Managers to do and perform all acts under the terms of said tripartite agreement and said plan, and to execute all contracts about the premises which the syndicate or subscribers personally might or could do; to receive all the securities which under the tripartite agreement and plan would be acquired by the syndicate, and to deposit all shares of common stock of the railways company which shall be so received or required, for the term of five years, with voting trustees, to be by them appointed, under such voting trust agreement, as they may deem expedient, etc.; to hold, manage, and sell for the syndicate account all bonds, stocks, certificates, and securities received or acquired by the syndicate under the terms of the tripartite agreement and plan, at such prices and on such terms as to credit, security, or otherwise, as they may deem expedient; with authority to acquire by purchase, with funds which they may derive from the sale of any of the original syndicate assets, bonds, stocks, certificates and securities of like character to those originally belonging to the syndicate, with power to sell all or any part of such reinvestments and again similarly to reinvest the proceeds of such sale: Provided that at no time should this power be exercised to such extent as shall entail upon any of the subscribers any personal obligation to pay for such newly acquired assets; the intention being that the power to purchase be limited to the use of the assets originally acquired and the proceeds of their conversion and reconversion. Nor should the subscribers, by

reason of such purchases, become liable for an amount beyond that of their respective subscriptions.

The fifth paragraph directs the manner of the application of all net proceeds resulting from sales of any part of said securities or from any other transactions of the Syndicate Managers therewith. Among the expenses payable was voting trust certificate or certificates representing 15,000 shares of common stock of the railways company to the Syndicate Managers as compensation; and one-fifth of any residue of any such stocks and net proceeds remaining after payment in full of all sums payable under certain clauses of the article; and the remaining four-fifths of such residue should be distributed by the Syndicate Managers among the subscribers, ratably, according to their respective interests. Such 20 per cent. should be the only compensation to be received by the Syndicate Managers for their services in the matter, saving the 15,000 shares of common stock; and, in case of no such residue, the Syndicate Managers should not receive any of the 20 per cent. compensation for their services.

Paragraph 6 prescribed the form of participation certificate and the beneficial interest of the purchaser of bonds of the transit company and bonds of the railways company.

Paragraph 7 provided that the Syndicate should continue until the 10th day of October, 1905, but might be extended beyond that date, provided such extension should not exceed one year after the 10th day of October, 1905, with discretion to the Syndicate Managers at any time to terminate the agreement upon proper notice to the subscribers.

Paragraph 8 named the Syndicate Managers judges as to whether at any time it was to the interest of the Syndicate to proceed further under the agreement, and authorized them to abandon the objects contemplated in the agreement for further proceedings thereunder, whenever it seemed to them expedient; in which event all of the stocks and other assets acquired by them and held for the account of the syndicate, and the proceeds of such stocks and other assets, should remain charged with the payment of all expenses and liabilities by them incurred, and should be applied in the manner indicated in the fourth article of the agreement.

Paragraph 9 provided for the matter of expenses in conducting and carrying on the syndicate management.

Paragraph 10 gave to the Syndicate Managers the exclusive custody of the assets and direction and management of the Syndicate during the term; with general powers conferred upon the management as may be deemed necessary in order fully and effectually to carry out what they may deem to be the purposes of the agreement. The Syndicate Managers in their discretion might submit to the subscribers any change or modification of the agreement, on the condition that, if assented to in writing by a majority in interest of the subscribers, such change or modification shall become a part of the agreement. And further exempting the Syndicate Managers from liability for errors of judgment or mistakes of law or fact, and from liability for any act or omission while endeavoring in good faith to carry out their purposes according to their judgment.

Paragraph 11 gave the Syndicate Managers the right to become subscribers thereto, with the same liabilities as other subscribers; with authority to the Syndicate Managers, from time to time, to offer, on terms deemed expedient, and to sell any assets to subscribers severally and ratably, in sums proportionate to their respective subscriptions, and in such offers they might provide for the disposition of any untaken stocks or other assets in such way as they might deem expedient.

Paragraph 12 provided that the agreement should bind and be for the benefit of the parties thereto, and of their respective executors and administrators.

This agreement the complainants refused to sign as subscribers, and on the 28th day of October, 1904, by letter addressed to said National Bank of Commerce and Brown Bros. & Co., they made tender of their check for $374,-774.40, "being payment in full of 84 per cent. of the amount of my allotment and subscription for the following securities," specifying the securities; and notifying the bank and Brown Bros. & Co. that they would demand delivery and

surrender to them of the proportion of the foregoing securities to which they were entitled,as the holder and owner of 11,000 shares of stock of the transit company, to wit, $446,160, as soon as the indebtedness of the transit company for which the check tendered is to be applied in payment shall have been discharged and such securities shall have been released; expressing their readiness at any time to pay in cash the remaining 16 per cent. of the amount of the subscription. This proposed payment, on the conditions expressed, was refused by the bank as the agent of the Syndicate Managers because of the complainants' refusal to execute the foregoing agreement. Thereupon on the 31st day of October, 1904, one day before the $7,000,000 debt became due, the complainants instituted suit in equity in the state circuit court of St. Louis, to recover the securities claimed by them under the alleged allotment in kind, and for an injunction. This suit named as defendants James Brown, ———— Brown, co-partners under the firm name and style of Brown Bros. & Co., the National Bank of Commerce, the St. Louis Transit Company, and the United Railways Company.

The substantive allegations of this bill are as follows: The complainants were the owners of 11,000 shares of the stock of the transit company. That the railways company granted a leasehold term of its property to the transit company for 40 years from October 1, 1899. That, in the operation of the street railway so conveyed, the transit company, in payment for betterments upon its earnings, acquired and owned securities consisting of bonds and stocks, cash, and other property to a large amount. That Brown Bros. & Co. were largely interested as promoters and financiers in the transit company and the railways company. That through their votes and influence they procured the adoption by the two corporations of the alleged plan of reorganization, whereby the transit company should surrender its leasehold and other properties, and the stockholders in the transit company should exchange their holdings as such for stock in the railways company at the rate of five for two, and whereby after the payment of an indebtedness on the part of the transit company, which it had secured by the deposit of bonds, stocks, and securities of great value, such bonds, stocks, and securities should be allotted and surrendered to the stockholders of the transit company in proportion to the amount of stock held by them at and for a fixed price, and aggregating in amount $7,000,000, to be used in the payment of the indebtedness of the transit company, for which it had hypothecated its securities. That to carry out the foregoing plan Brown Bros. & Co. became contracting parties with the two railroad companies, and on October 20, 1904, in pursuance of said plan, apportioned the amount of the indebtedness of the corporation to be paid by the complainants at $446,160, upon the payment of which the complainants were entitled to receive an amount of the stocks, bonds, and securities to belong to the whole number of subscribers to the $7,000,000 which should be apportioned to the amount paid by complainants as compared with said total purchase price of $7,000,000. It alleged that said allotment was made and delivered to them in writing on October 20, 1904, in accordance with a proposal addressed to them on October 11, 1904, by Brown Bros. & Co. The bonds, stocks, and securities thus to be divided are then specified. That as full compensation for their services, expenses, and charges in effecting such plan, Brown Bros. & Co. were to receive 15,000 shares of common stock of the railways company the market value of which was about $400,000.

The bill then charged that Brown Bros. & Co., not satisfied with said bonus to themselves, had contrived and devised a fraudulent scheme for the purpose of extorting from the contributing stockholders of the transit company other and additional compensation by the instrumentality of the form of a contract drawn up and signed by Brown Bros. & Co. and deposited with the defendant bank, with instructions to the bank, as agent of Brown Bros. & Co., to demand the signature of each contributing stockholder to said contract before permitting him to pay into the hands of the bank as the receiving agent that part of the $7,000,000 purchase price allotted to be paid by said stockholders; and to that end Brown Bros. & Co. appointed the said bank to collect the several allotments and to require the stockholders so contributing to become a party to the aforesaid unreasonable and fraudulent form of contract.

The bill then alleged that being notified that 84 per cent. of said contribution allotted to them must be paid on or before October 28, 1904, at the said bank, they presented themselves there and proffered to it payment of said 84 per cent., amounting to the sum of $374,774.40, and delivering to said bank a written notification that the complainants would demand a delivery and surrender to them of that portion of the securities which they had purchased by such check, and to which they were entitled as the owners of 11,000 shares of the transit company stock; that the bank refused to retain said check because the complainants would not sign and become a party to the alleged inequitable and fraudulent contract proposed by defendants Brown Bros. & Co., by the terms of which contract Brown Bros. & Co. would be entitled to retain all the assets, consisting of bonds and stocks in the railways company and other securities that belonged to the subscribers of said fund and stockholders in the transit company, for a period of two years, with unlimited power to charge such assets with expenses, costs, and other disbursements, and with unrestricted right to dispose of the same, and to retain, in addition to the 15,000 shares of stock of the railways company, a further compensation of one-fifth of all profits which might be made in stock jobbing, such assets for a period of two years; and that said contract further undertook to relieve said defendants Brown Bros. & Co. from all liability to complainants and other owners of the assets to be retained by said Brown Bros. & Co.

The bill further charged that the design of said proposed contract was to give Brown Bros. & Co. unlimited trading power over the bonds, stocks, and securities purchased and paid for in advance by complainants and other contributing stockholders. And to that end they undertook by said contract to assume the role and capacity of managers for the stockholding purchasers of said securities. Then, as a mere conclusion from the facts alleged, the bill charges that said Brown Bros. & Co. sought to exact from complainants the widest opportunity, without responsibility, for the practice of the grossest frauds for which the terms of said contract afford no redress. The complainants expressed their readiness to keep their tender of $446,160 good, and to pay the same into court at any time, and offer now to do so. The further allegation is made that Brown Bros. & Co. are threatening to allot the $446,160 of complainants' aforesaid payment for the aforesaid securities to some other person or persons, who shall become a party to the said contract; and "are further informed and believe that the Bank of Commerce now makes claim that, after refusing the tender of payment so made by plaintiffs, it paid the amount which had been allotted plaintiffs to pay on the said 28th day of October, 1904, to wit, $374,774.40; and that, unless plaintiffs will sign and become parties to the above-described unconscionable contract, the bank will claim for itself all the benefits of such payment. Plaintiffs are advised that said bank had no authority to act for them in that matter, and further could acquire no rights to the securities belonging to plaintiff by any such action." It is further alleged in this connection that said Brown Bros. & Co. have attempted to make to said bank the allotment of $446,160 which had been duly allotted to plaintiffs on October 20, 1904, and that they have put in the possession of said bank a fraudulent participation receipt for such pretended allotment.

The bill then alleged that the complainants could not go on the market and purchase said stock in specie, but would be compelled to buy only certificates of participation in said blind pool. Wherefore the general market would furnish no correct standard of the true value of any such securities. This is followed with a general allegation that the whole scheme of the alleged reorganization of the railroad companies was fraudulently designed; that the railroads and their stockholders, as far as they had concurred therein, were induced to do so through misrepresentation, deception, and fraud on the part of Brown Bros. & Co., who designed to appropriate to themselves the assets of the transit company.

The prayer of the bill is that the attempted reorganization and disposition of the assets of such corporation be set aside and annulled, and that the assets of the transit company be restored to it and its stockholders. If the court should deem it unnecessary to annul the steps heretofore taken by said

corporations, then that the court decree that Brown Bros. & Co. be temporarily enjoined and restrained from making, or attempting to make, any change in the allotment of the $446,160 allotted to be paid by complainants; that Brown Bros. & Co. be enjoined from receiving or attempting in any manner to dispose of such portion of the stocks, bonds, and securities as belong to complainants; that the bank be enjoined from interfering with complainants' right in the premises and from setting up any claim to the stocks, bonds, and securities purchased by complainants; that on final hearing all said injunctions be made perpetual, and Brown Bros. & Co. and the bank be required to deliver up to complainants all of said securities upon the payment by complainants of the said sum of $446,160; that the above-described contract sought to be enforced as a condition to their right to pay for the stocks, bonds, and securities allotted to them be declared fraudulent and void; and that complainants be adjudged to be entitled to receive, hold, and own all of said stocks, bonds, and securities apportioned to them as above stated upon the payment of the above amount. And, further, that the railroad companies be enjoined and restrained from directly or indirectly doing any act or taking any step in interference with complainants' rights to the bonds, stocks, and securities purchased by them as aforesaid, or in any way aiding or abetting the said Brown Bros. & Co. or the bank in any matter or thing looking to the enforcement of the claims and demands of the said Brown Bros. & Co. under the above-described form of contract.

To this bill was appended, as exhibits, the circular letter from Brown Bros. & Co. of September 27, 1904, and the application from complainants to the bank, of date September 29, 1904, requesting the participation in said syndicate to the amount of $1,000,000, and the supplemental proposition contained in the circular letter of October 11, 1904, from Brown Bros. & Co.; also the allotment and call letter of October 20, 1904.

On presentation of this bill the judge of the state circuit court, without notice to any of the defendants, granted a temporary injunction as prayed for, setting the same down for hearing on November 11, 1904, to show cause, etc.

Service of the summons on said petition was made November 1, 1904, upon James Brown in the city of St. Louis, but no service was made upon any other member of said firm of Brown Bros. & Co. Service was also made on the same date on the two railroad companies and the bank.

On the 14th day of November, 1904, the defendant James Brown presented to the state circuit court his petition for removal of the controversy into the United States Circuit Court. This petition for removal, duly sworn to, disclosed the facts that the complainants and the two railroad companies and said bank were resident citizens of the state of Missouri, and that James Brown and Brown Bros. & Co. were resident citizens of the state of New York. The petition for removal set out in great detail the controversy, as detailed in the bill of complaint and exhibits, and other allegations, claiming that the matter presented a separable controversy as to the defendants Brown Bros. & Co. The requisite bond for removal being given and approved, the cause was removed into said United States Circuit Court, where motion was promptly made by complainants to remand the cause to the state court, on the ground that no separable controversy was presented by the bill as to the defendants Brown Bros. & Co. This motion was heard by Hon. Walter H. Sanborn, judge of the United States Circuit Court for this circuit, and was by him denied. 136 Fed. 439.

After the cause was so removed into the United States Circuit Court the complainants filed a bill of repleader to conform more nearly to the equity practice in such matters in the federal court. The only additional allegations in this bill of repleader affecting the merits are more specific as to the alleged fraud of Brown Bros. & Co. in bringing about the reorganization plan. The cause on its merits, after issue joined and proofs taken, was heard before Hon. John C. Pollock, United States district judge assigned to said court, and, after a full hearing, decree was entered dismissing the bill, from which actions of the Circuit Court the complainants have appealed to this court.

144 F.—48

Henry W. Bond and Everett W. Pattison (Bond & Bond, on the brief), for appellants.

H. S. Priest, for appellees.

Before HOOK, Circuit Judge, and PHILIPS and TRIEBER, District Judges.

PHILIPS, District Judge, after stating the case as above, delivered the opinion of the court.

The want of jurisdiction over this controversy is pressed with zeal and ability by appellants' counsel, notwithstanding the opinion of Judge Sanborn on the circuit in overruling the motion to remand. As the defendants, the two railroad companies and the bank, were citizens of the same state as the complainants when the suit was instituted, it was not removable from the state to the federal court on the petition of James Brown, the nonresident citizen, unless the controversy between himself and the complainants could be wholly and fully determined as between them without the necessary presence of either of the other defendants. Section 2, Act March 3, 1887, c. 373, 24 Stat. 553, as corrected August 13, 1888 (chapter 866, § 2, 25 Stat. 434, Supp. Rev. St. 611 [U. S. Comp. St. 1901, p. 509]). It is conceded that the question of such separability as applied to this case is to be determined from the face of the bill of complaint.

An analysis of the bill warrants the court in eliminating from the consideration of this question the two street railway companies. The only allegation of the bill squinting at the part played by the railroad companies pertinent to this issue is as follows:

"Plaintiffs further charge that the whole scheme of alleged reorganization of the transit company and United Railways Company was fraudulently designed, and that said railroads and their stockholders, as far as they have hitherto concurred therein, were induced to do so through misrepresentation, deception, and fraud on the part of the said Brown Bros. & Co."

In the first place it is not alleged that the railroad companies in any wise participated in any fraudulent design or acts in furtherance of any wrongful scheme, or that they did anything to promote it. The mere charge in a bill in equity that by a fraudulent scheme a reorganization of two railroad companies was fraudulently designed by the promoters is a mere brutum fulmen. It states no fact presenting issuable matter. The allegation is but a conclusion of law by the pleader, and no relief could be administered thereon. Smith v. Sims, 77 Mo. 269-274; Bliss on Code Pleading, 211; McCrelish v. Churchman, 4 Rawle (Pa.) 26; Moss v. Riddle & Co., 5 Cranch, 351, 3 L. Ed. 123; Very v. Levy, 13 How. 345-361, 14 L. Ed. 173; Marquez v. Frisbie, 101 U. S. 473, 478, 25 L. Ed. 800.

The gravamen of the bill, in its whole texture, is for the enforcement of complainant's alleged rights growing out of and dependent upon the existence of the consummated reorganization scheme. While a party within the rule expressed in Hardin v. Boyd, 113 U. S. 756-763, 5 Sup. Ct. 771, 28 L. Ed. 1141, where he is not certain as to what specific relief he is entitled, may so frame his bill as to entitle him to an alternative prayer for relief; yet the relief sought, whether the one or the other,

must follow from the allegations of fact, which of themselves authorize and characterize the particular relief. He may not on a bill disclosing that he recognizes and approbates a given transaction, praying for the enforcement of his asserted rights thereunder, in the same breath reprobate the transaction and ask that it be set aside for fraud, particularly without specifying any act or fraud vitiating it.

The removability of the suit therefore resolves itself into the single question as to whether this controversy exists wholly between the complainants, citizens of Missouri, and the defendants, Brown Bros. & Co., citizens of the state of New York, and can be fully determined as between them without the presence of the National Bank of Commerce. If it can be, the nonresident was entitled to remove the case into the United States court.

What the complainants seek is the specific enforcement of the alleged contract made between them and Brown Bros. & Co. The bank was no party to that contract. "The general rule is, that the parties to the contract (the subject of specific performance) are the only proper parties to the suit for its performance, and, except in the case of an assignment of the entire contract, there must be some special circumstances to authorize a departure from the rule." Willard v. Tayloe, 8 Wall. 557, 571, 19 L. Ed. 501. As said in Trasher v. Small, 3 Mylne & Craig, 69, quoted with approval by the court in Willard v. Tayloe, supra:

"The court assumes jurisdiction in cases of specific performance of contracts, because a court of law, giving damages only for the nonperformance of the contract, in many cases, does not afford an adequate remedy. But in equity as well as at law, the contract constitutes the right, and regulates the liability of the parties; and the object of both proceedings is to place the party complaining, as nearly as possible, in the same situation as the defendant had agreed that he should be placed in. It is obvious that persons, strangers to the contract, and therefore neither entitled to the rights nor subject to the liabilities which arise out of it, are as much strangers to a proceeding to enforce the execution of it as they are to a proceeding to recover damages for the breach of it."

If the complainants were entitled to any particular segregated part of the securities in question, which had passed by assignment from Brown Bros. Co. to the bank, with notice, or which designated portion the bank had obtained possession of subject to the superior rights of the complainants, and the suit were for the recovery of that specific thing, the bank would be a necessary, if not an indispensable, party. Or, if the securities, to which the complainants were entitled to an aliquot part, had been in the custody of the bank as bailee for the reorganization committee, and the complainants sought to have their share therein allotted and delivered to them, the bank would be an essential party. But none of these conditions are disclosed by the bill. It charges only in this respect that the complainants "were entitled to receive an amount of the stocks, bonds and other securities to belong to the whole number of subscribers to the $7,000,000 which should be proportioned to the amount paid by plaintiffs as compared with said total purchase price of said $7,000,000"; and that said allotment was made in writing in response to their letter of proposal.

The connection of the bank with this matter is substantially as follows,

as described by the bill: That Brown Bros. & Co. had sent to and deposited with said bank the form of a contract executed by them, with instructions that the bank, as the agent of said Brown Bros. & Co., should demand the signature of the contributing stockholders to said contract before permitting them to pay to the bank, as the receiving agent, the allotment in the $7,000,000 purchase price; that said Brown Bros. & Co. had appointed the said bank to collect the several allotments, etc., and then deliver the participating receipts; and that the complainants, having refused to accede to the terms and conditions of such submitted contract, the bank had refused to deliver the allotment, and that it made claim to such allotment by having paid to Brown Bros. & Co. the required sum of $374,774.40. This is coupled with the distinct allegation in the bill "that said bank had no authority to act for them in that matter, and further could acquire no rights to the securities belonging to the plaintiffs by any such action."

No matter what the transaction between Brown Bros. & Co. and the bank, after the making of the contract in question between the complainants and Brown Bros. Co., and no matter what right the bank may, as against Brown Bros. & Co., assert under an allotment to it, in no degree concerned the complainants, as no dealings, without their consent, between Brown Bros. & Co. and the bank could in any wise exonerate Brown Bros. & Co. from their obligation, if any, to make the allotment due to the complainants.

In Willard v. Tayloe, supra, the bill was for specific performance of a contract for the sale of certain real estate which the defendant had leased to the complainant with the option to the lessee to purchase. Discussing the effect of an alleged transfer of an interest in the lease to the complainant's brother, the court said:

"The transfer, by the complainant to his brother, of one-half interest in the lease * * * in no respect affects the obligation of the defendant, or impairs the right of the complainant to the enforcement of the contract. The brother is no party to the contract, and any partial interest he may have acquired therein the defendant was not bound to notice. The owners of partial interests in contracts for land, acquired subsequent to their execution, are not necessary parties to bills for their enforcement. The original parties on one side are not to be mixed up in controversies between the parties on the other side, in which they have no concern. If the entire contract had been assigned to the brother, so that he had become substituted in the place of the complainant, the case would have been different."

It would be no defense to this bill for the defendants Brown Bros. & Co. to set up that they had agreed to allot, or had allotted, to the bank $446,160 of shares of the seven millions of securities. And if, as the bill charges, Brown Bros. & Co. had placed in the hands of the bank a participation certificate or receipt "for such pretended allotments," it in no wise concerns the bank that the complainants under a contract between them and Brown Bros. & Co. are demanding a participation.

Much was said in argument at the hearing about the participating receipt being negotiable in form, rendering it important to the complainants to have its transfer by the bank enjoined. There is no allegation in the original bill tendering such issue for consideration. The allegation only is that Brown Bros. & Co. have put in the possession

of said bank a fraudulent participation receipt for such pretended allotment. Even if such participation receipt had been issued or was held by the bank, it would not alter the result. Such term—"negotiable in form"—as applied to such a receipt, would not imply that it would be negotiable in the sense of the law merchant so as to pass to an innocent holder for value. It would only imply that such receipt would be transferable by the holder to a third party, who would acquire the rights of the original holder, no more and no less.

It would be more academic than useful, in the disposition of this question, to discuss the distinction between necessary, indispensable, essential, and proper parties to a suit under the judiciary act, as affecting its removability on the ground of a separable controversy. The entire controversy between the complainants and Brown Bros. & Co. is whether or not the complainants are equitably entitled to the delivery and transfer of an allotted interest in said securities. If, under the contract claimed by the complainants, they are entitled to this allotment, without signing on their part the contract finally propounded by Brown Bros. & Co. and deposited with the bank, they are entitled to the relief prayed for. If they are not so entitled, their whole controversy must fall to the ground. A decree against Brown Bros. & Co. that they make the claimed allotment in favor of the complainants, which they had the power to do from aught that appears on the face of the bill, would give the complainants all the relief to which they are entitled under the contract. And, as already stated, whatever may be the mutual rights and obligations as between Brown Bros. & Co. and the bank, by reason of the alleged dealings between them, is as to these complainants res inter alios acta.

The case is wholly unlike that of Wilson v. Oswego Township, 151 U. S. 56, 14 Sup. Ct. 259, 38 L. Ed. 70, and kindred cases. Where bonds are deposited in escrow with a bailee, to be delivered by him in kind upon the performance of some condition precedent, to a third party, such bailee is a necessary party to a suit to recover the specific thing. In the case at bar the thing to which the complainants' alleged contract entitled them was an allotment of an aliquot share in certain securities not held by the defendant bank, but by an outside trust company, not a party to this suit.

There is another class of cases, like that of Torrence v. Shedd, 144 U. S. 527, 12 Sup. Ct. 726, 36 L. Ed. 528, which was a partition suit. In its progress a controversy arose among the parties touching the title to an undivided share of the property. In such case, where the object of the suit is to administer the entire estate according to the rights of all the parties interested therein, in which it is essential to marshal and settle conflicting interests, and sell or allot freed from such complexity, the suit is an indivisible unit, and all such claimants and persons in interest are necessary parties to accomplish the very end desired.

The case at bar is more nearly allied, in the principle involved, to that of Barney v. Latham, 103 U. S. 205, 26 L. Ed. 514. The bill presented a case against certain individuals and a corporation. It alleged that the complainants were in equity the owners of 1-37 of certain lands

earned by them in the construction of a certain railroad, some of which lands the individual defendants had sold and received the proceeds to a very considerable extent, 1-37 of which (the bill alleged) in equity belonged to the complainants. It was further alleged that the individual defendants had placed the title to the remainder of the lands in the defendant corporation. The question presented was whether or not it presented a separable controversy. That arose under the judiciary act of 1875. After asserting that a defendant may be a proper but not an indispensable party to the relief asked, within the purview of the removal statute, the court said there were two controversies; one was a controversy between the complainants and the land company, the corporation, "to the full determination of which the other defendants are not, in any legal sense, indispensable parties, although, as stockholders in the company, they may have an interest in its ultimate disposition. Against the latter, as a corporation, a decree is asked requiring it to convey to the plaintiffs the undivided 2-9 of 1-37 of certain lands, and to account for the proceeds of the lands by it sold subsequently to the conveyance from the railroad company. But the suit as distinctly presents another and entirely separate controversy, as to the right of the plaintiffs to a decree against the individual defendants for such sum as shall be found, upon an accounting, to be due from them upon sales prior to the conveyance from the railroad company. With that controversy the land company, as a corporation, has no necessary connection. It can be fully determined as between the parties actually interested in it without the presence of that company as a party in the cause. Had the present suit sought no other relief than such a decree, it could not be pretended that the corporation would have been a necessary or indispensable party to that issue. Such a controversy does not cease to be one wholly between plaintiffs and those defendants, because the former, for their own convenience, choose to embody in their complaint a distinct controversy between themselves and the land company. When the petition for removal was presented, there was in the suit, as framed by plaintiffs, a controversy wholly between citizens of different states * * * and the individual defendants, citizens of New York, etc. And since the presence of the land company is not essential to its full determination, the defendants, citizens of New York, Wisconsin, and Massachusetts, were entitled, by the express words of the statute, to have the suit removed to the federal court."

The case here is much stronger in favor of the right of removal, in that the relief asked by the complainants against Brown Bros. & Co. rests entirely upon the contract between them, the enforcement of which would give to the complainants all they can ask. The motion to remand was properly denied by the Circuit Court.

It remains to consider the case on its merits. While it is to be conceded that, no matter how others may be affected by a decree, it should not the less entitle the suitor to the relief the law of the land affords him as an individual; yet, where the particular relief sought involves injustice and disaster to others having a direct interest in the subject-matter on which the decree is to operate, common right demands that such suitor should come not only with clean hands, but his right should

leave no reasonable doubt in the judicial mind of its absolute justice. For the remedy by specific performance is not an unqualified right. It lies within the domain of judicial discretion, not arbitrarily exercised. Within this limitation the court may refuse its assistance whenever there is any uncertainty or doubt about the specific terms of the proposed contract, or any well-founded conviction that its specific enforcement, under all the facts and circumstances of the case, would be harsh and unreasonable, or more hurtful to the rights of others in interest than its denial to the suitor. Dalzell v. Dueber Mfg. Co., 149 U. S. 325, 13 Sup. Ct. 886, 37 L. Ed. 749; Nickerson v. Nickerson, 127 U. S. 677, 678, 8 Sup. Ct. 1355, 32 L. Ed. 314.

The obstruction, if not the disruption, of the plan of reorganization, or an allotment in kind of an aliquot portion of the securities intended to be managed as a unit by the Syndicate for promoting the interests of all the subscribing stockholders, might thwart the entire scheme, and certainly would operate as an inequality between the claimants and the other shareholders. The evidence shows that out of 210 shareholders the complainants are the only active dissenters, and only four other shareholders, of small holdings, failed to execute the agreement.

The complainant's cause of action rests upon contract. The alleged contract had its root in the circular letter of September 27, 1904, issued by Brown Bros. & Co. On objection made by a representative of complainants to so much of said letter as left it optional with Brown Bros. & Co. whether the shareholders should be allotted a subscription to the purchase price of the securities proportioned to their holdings, the Syndicate Managers, on October 11, 1904, addressed another circular letter to the shareholders of the transit company, which, in substance, stated that upon the terms and conditions of the letter of September 27, 1904, they made a supplemental proposition to be accepted on or before the 17th day of October, 1904, and if not accepted on or before said date it would neither be continued nor renewed. This letter stated that:

"We have determined to allow each shareholder of the St. Louis Transit Company, in the proportion which the number of his shares of stock in said company bears to the total amount of shares outstanding, to participate in the syndicate purchase to be controlled by the syndicate managers. To each shareholder who shall subscribe in the way hereinafter provided for his proportion of said syndicate purchase on or before the time designated we will allot such proportion. Of course, any application heretofore made by any such stockholders will be treated as merged in any application which he will make under this proposal. If he makes no application hereunder, his prior application will stand."

On the receipt of this letter the representative of the complainants called upon said bank and made inquiry as to whether it would be necessary for them to make a second application for such allotment, and were advised that the application made under the letter of proposal of September 27th was sufficient. On October 20, 1904, Brown Bros. & Co. wrote to the complainants saying that:

"Referring to our letter of September 27th, 1904, and to our supplementary notice of October 11th, 1904, addressed to the shareholders, etc., and also to your formal application through the National Bank of Commerce as our

agents, for $1,000,000 underwriting in this syndicate, we have allotted you, in accordance with the terms of our offer of October 11th, 1904, a participation of $446,160, being 40.56 per cent of the par value of your holdings of St. Louis Transit Company stock."

And made a call upon them for 84 per cent. of the subscription, namely, $374,774.40, in favor of the National Bank of Commerce, on or before Friday, October 28, 1904.

Pending these transactions Brown Bros. & Co., in pursuance of the authority, which we hold inhered in the tripartite agreement for reorganization, and for effectually carrying out the useful object to be accomplished by the Syndicate Managers, drew up an agreement for the purchase of the bonds and stocks of the United Railways Company. This agreement declared that the "subscribers form a syndicate for the purpose of promoting and carrying out said tripartite agreement." Among its provisions was that 15,000 shares of common stock of the United Railways Company, acquired and to be acquired under said agreement and plan, should be paid as compensation to the Syndicate Managers for their services in securing and underwriting the plan and tripartite agreement aforesaid, etc., and also one-fifth of any residue of any such stocks and net proceeds remaining after the payment in full of all sums payable under clauses 1, 2, and 3 of said article, and fixing a period of one year, or two conditionally, for operating the syndicate. This agreement was required to be signed by the subscribers as a condition to receiving the participation receipt from the bank as the agent of Brown Bros. & Co. This the complainants refused to comply with, and on the 28th day of October, by letter, submitted to the bank their own proposition of subscription, which, in substance, was a tender of a check for $374,774.40, "being payment in full of 84 per cent. of the amount of my allotment and subscription to the following securities"— securities enumerated. And then proceeded as follows:

"This is to further notify you that I shall demand delivery and surrender to me of the proportion of the foregoing securities to which I am entitled as the holder and owner of 11,000 shares of St. Louis Transit Company stock, to wit, $446,160, as soon as the indebtedness of the transit company for which check herewith tendered is to be applied in payment shall have been discharged and such securities shall have been released."

The question to be decided therefore resolves itself into the single proposition: Were the complainants entitled on payment of the $374,-774.40, and a willingness to pay the remaining 16 per cent., to an allotment in kind, subject only to the payment of the debts for which the securities were pledged, despite the conditions for compensation which the syndicate management and the provisions for the control and management by them for a given period? All charges made in the bill affecting the integrity of Brown Bros. & Co. in organizing the syndicate were withdrawn at the hearing. The evidence shows that one of their representatives participated in the reorganization scheme at a meeting of the two railway companies. And, by a persuasive weight, the evidence shows that one of the managers of the complainant's firm had knowledge, as early as September 25, 1904, of the understanding with the Syndicate Managers for their compensation and retention of control for one year or two years.

In addition to this, the tripartite agreement, which it is clearly inferable must have been known to the complainants to be contemplated in some form, as indispensable to the consummation of a plan of reorganization to be worked out by the syndicate, was in fact formulated contemporaneously with the circular letter of September 27, 1904. While the proposal contained in the letter of September 27, 1904, was supplemented by that contained in the circular letter of October 11, 1904, its information and conditions are to be read and applied in connection with the later letter. The fourth paragraph of the former stated that:

"The syndicate, of which the undersigned are managers, has been organized to purchase certain bonds and stocks mentioned in this tripartite agreement, belonging to the St. Louis Transit Company, and upon a plan and terms heretofore agreed between the syndicate and managers."

Furthermore, this letter stated:

"That it is the desire of the Syndicate Managers to afford to the shareholders of the transit company an opportunity to participate in such purchase of said bonds and stocks under said syndicate plan. * * * This offer is, however, entirely without consideration and purely voluntary on the part of the Syndicate Managers."

And in the application which followed, on September 29, 1904, by complainants to said bank as agent for Brown Bros. & Co., they, as owner and holder of 11,000 shares of the capital stock of the transit company, stated that "having deposited said shares with you, under the proposal of said Syndicate Managers under date of September 27, 1904, does hereby request participation in said syndicate to the amount of $1,000,000," etc.; and concluded as follows:

"And I do hereby authorize you for me and in my name to subscribe to any plan or syndicate agreement that may be written and approved by said Syndicate Managers to the full extent of the amount of syndicate subscription hereby applied for."

It does not admit of debate that whatever "the terms" were, situated as were the complainants with the knowledge they had, bound them, if they accepted the proposal, no matter if such terms were not recapitulated in the letter. So the letter of October 11th, supplementing the proposition, advised the complainants that they were "to participate in the syndicate purchase to be controlled by the Syndicate Managers; and by the preceding part of the letter "upon the terms and conditions of our letter to you of September 27, 1904, and of the application which accompanied the same."

Could a shareholder, with the antecedent knowledge of these complainants, and with such references in the letters to plans and terms of the syndicate agreement, accept such proposal without inquiry or investigation into what that plan and its terms were, and demand to be let in freed from its conditions and provisions? There was no concealment or misrepresentation or device practiced by the syndicate management to induce the agreement, plan, or terms. So far from anything appearing indicative of unconscionable oppression or hardship in them to warrant their annulment by a court of equity, the only direct evidence touching such matter is that they were neither unusual nor un-

reasonable. The very purpose of a syndicate organization in such conjuncture is to formulate and work out a plan for the enhancement of the properties of the reorganization by a committee of management, which promises to avert impending bankruptcy or ruin, and to bring stability and profit out of financial disaster. The proofs in this case demonstrate both the wisdom and propriety of this reorganization scheme and syndicate management, in that the stocks which were depressed far below par immediately advanced to a premium in the markets, and at the time of taking the testimony herein they had risen 16 above par.

Where a party, as did the complainants in this case, in response to a proposal of sale, submits an acceptance upon variant terms, it is a counter proposition of purchase, which if not accepted by the vendor amounts to no contract. Carr v. Duval, 14 Pet. 79, 83, 10 L. Ed. 361; Hennessey v. Woolworth, 128 U. S. 442, 9 Sup. Ct. 109, 32 L. Ed. 500; De Sollar v. Hanscome, 158 U. S. 216, 15 Sup. Ct. 816, 39 L. Ed. 956; Minneapolis & St. Louis Railway Company v. Columbus Rolling Company, 119 U. S. 149, 7 Sup. Ct. 168, 30 L. Ed. 376; Kleinhans v. Jones, 68 Fed. 749, 15 C. C. A. 644.

There is no basis therefore to support the contention of the learned counsel for complainants that there is an express trust in this case enforceable in favor of the complainants. It is not an express trust for the palpable reason that the shares represented by the complainants were exchanged by them for voting certificates in compliance with the terms specified in paragraph "d" of article 3 of the agreement, which the complainants still hold, and in article 4 it is expressly declared that "the covenants between the respective parties hereto shall not be construed as enuring to the benefit or advantage of any person or corporation whose name is not subscribed to this agreement as a party thereto."

The complainants were left perfectly free thereafter to accept or reject the terms proposed respecting the exchange of their shares in the transit company stock for such voting certificates. Therefore the complainants' rights, if any, capable of enforcement in law or equity, must depend according to their bill of complaint upon terms subsequent to the tripartite agreement. Not until the complainants paid for the allotment to be represented by a participating receipt, and not until they executed the agreement sent the bank by Brown Bros. & Co., could the latter be held as trustees for the complainants.

If the settlor, even if there be no valuable consideration, makes an explicit declaration of a trust, duly executed, with the intention of being obligatory upon him, equity will enforce such trust. But if it be a mere agreement, without consideration, to execute an agreement declaratory of a trust, courts will not enforce it. Perry on Trusts (5th Ed.) § 96-97. And this rule should apply with especial force to a mere promise to execute an agreement, out of which a trust relation might arise between the settlor and he promisee, when the promise is conditioned upon the promisee executing on his part a collateral obligation, which he refuses to do. No implied trust can be evoked out of this transaction, for the simple reason that the complainants as vendees did not accept the proposition on the conditions submitted by the vendors.

It results that the decree of the Circuit Court dismissing the bill of complaint must be affirmed. It is so ordered.

## On Rehearing.

PER CURIAM. The motion for a rehearing renews the principal arguments made on the original hearing, which, after careful consideration, were unanimously held to be untenable. On the appeal counsel for appellants urged, and rightly, that the removability of the controversy was determinable alone from the face of the bill of complaint as it then appeared. Still in their brief on the petition for a rehearing on the question of the removability it is insisted that the court in its opinion on that question did "not touch the points in issue in the bill and answer," and, further, that "Brown Bros. & Co. did not claim in their answer that they only gave a participation receipt for a like amount to the bank; on the contrary, they expressly admitted in their answer that the same participation receipt made out to appellants was vested in the bank." What the court did say in its opinion was that:

"A decree against Brown Bros. & Co. that they make the claimed allotment in favor of the complainants, which they had the power to do from aught that appears on the face of the bill, would give the complainants all the relief to which they are entitled under the contract; and whatever may be the mutual rights and obligations as between Brown Bros. & Co. and the bank, by reason of the alleged dealings between them, is, as to these complainants, res inter alia acta."

This was correct. There is no intimation in the original bill that, if Brown Bros. & Co. should be decreed to issue to the complainants a participating receipt according to the terms of the alleged contract, they could not comply therewith for the reason that they had made allotments and issued receipts covering the entire amount of the $7,000,000 of securities. The prayer of the bill was simply that Brown Bros. & Co. be enjoined from making or attempting to make any change in the allotment of the $116,160 allotted to be paid by complainants, and that they be enjoined from receiving or attempting to dispose of such portion of the stocks, bonds, and securities belonging to the complainants, and that the bank be enjoined from interfering with complainants' right in the premises and from setting up any claim to the stock, bonds, and securities purchased by complainants, and, further, that Brown Bros. & Co. and the bank be required to deliver up to complainants all of said securities, and that complainants be adjudged to be entitled to receive, hold, and own all of said stocks, bonds, and securities apportioned to them as above stated, upon the payment of the stated amount. The bill nowhere disclosed that the defendant bank had any of the securities, bonds, or stocks, nor did the prayer even ask that the participating receipt held by the bank be delivered to the complainants, but that complainants "be adjudged to be entitled to receive, hold, and own all of said stocks, bonds, and securities apportioned to them as above stated, upon the payment of the above amount." The participating receipt did not pass title to any specific securities, but only to the right to receive the pro rata proportion of cash or securities, or both, subject to the syndicate agreement. If the complainants are entitled to share in the distribution of the securities purchased by Brown Bros., and for this reason to a specific performance, the relief to be granted would be for

so many securities which Brown Bros. would have to deliver to them. It would be immaterial whether these securities are the same which were retained by Brown Bros. for themselves, or those sold to the bank, or others purchased in open market. All complainants ask in their bill is for a participating receipt under their agreement, and, so far as complainants are concerned, it matters not where Brown Bros. & Co. procure such a receipt, as long as they can make delivery thereof to complainants, if by the decree of the court they are directed to do so. The bill admits that these receipts can be purchased in open market.

The claim that "appellees Brown Bros. & Co. created an express trust in favor of appellants, entitling them to receive immediately the 'negotiable receipt,' and subsequently the securities represented thereby," was not made in the original bill upon which the cause was removed. The first intimation of a claim of a trust relationship is in the bill of repleader and amended bill, which was filed after the removal of the cause, and can, of course, not be considered in determining the right to remove, which depended solely upon the allegations contained in the bill then before the state court.

The claim that the authority given to the bank by appellants was irrevocable, and never pretended to be revoked, was not only not made in the original bill, but was specifically denied. The bill charges that "said bank had no authority to act for them in that matter and could acquire no rights to the securities belonging to plaintiffs by any such action." Looking at the face of the original bill, as it was when the petition for removal was presented, it in no wise made the right to relief dependent upon the transactions had between Brown Bros. & Co. and the bank, and therefore an answer by Brown Bros & Co. that they had made an allotment of similar amount to the bank, and that the bank asserted title thereto, would have constituted no defense. Suppose the complainants had named Brown Bros. & Co. as the sole defendants in this bill, and they had set up in their answer the transaction by which the bank acquired the participating receipt and claimed that the bank was an indispensable or necessary party? Could such a defense have been entertained for one moment by the court? The complainants could have successfully said that the transaction in no degree absolved Brown Bros. & Co. from the letter of their obligation to them, and as the plea did not disclose that the bank held a single one of the securities, or that participating receipts had been issued to the full extent of the $7,000,000, there would have been nothing disclosed to show, if a decree went directing the allotment claimed, that it would not have afforded full measure of relief to the complainants without the presence of the bank.

Touching the merits of the case, to which the motion for a rehearing goes in part, it is sufficient for the court to say that it adheres to its opinion thereon and perceives no additional reason in the earnest reargument made by the counsel on this motion either for changing or adding to the views there expressed. Independent of all these considerations, the complainants' bill should fail for the reason that they did not accept the ultimate proposal of Brown Bros. & Co. except upon terms imposed by the acceptor which were different from those proposed by the vendor.

The request to certify the jurisdictional question involved to the Supreme Court, under Act March 3, 1891, c. 517, § 6, 26 Stat. 828 [U. S. Comp. St. 1901, p. 549] establishing United States Circuit Courts of Appeals, must be denied for two reasons:

First. Questions should not be certified after the case has been decided. Louisville N. A. & C. Ry. v. Pope, 20 C. C. A. 253, 74 Fed. 1; Andrews v. National F. & P. Works, 23 C. C. A. 454, 77 Fed. 774, 36 L. R. A. 153. In the first-cited case Judge Jenkins, speaking for the United States Circuit Court of Appeals for the Seventh Circuit, in which a similar motion was made, said:

"Whether a question should be certified rests within the discretion of the court, but it is not a discretion the exercise of which may be invoked by a party as of right. The certification is for the instruction of the court upon doubtful questions; and while in cases of magnitude and upon intricate and doubtful questions of law the court upon the argument may perhaps properly indulge the suggestion of counsel of the desirability of the advice and instruction of the Supreme Court, we are compelled to say that this formal motion is not conformable to correct practice. It cannot be tolerated that the argument of a cause may be thus split up into sections. If the suggestion of counsel may be entertained that a question in the cause should for any reason be certified, the suggestion must come at the argument of the case upon its merits, when the court can be fully advised whether the questions involved are so intricate and doubtful and essential to be resolved that the instruction of the Supreme Court is necessary or desirable. If the present motion were entertained, it would furnish a precedent for a practice that would seriously interfere with the proper dispatch of the business of the court. It may be that upon the argument of the cause upon its merits some question may be raised which, upon consultation, the judges may deem proper to certify. We shall reserve the right and discretion so to do if and when we deem it needful to the proper determination of the cause. We must decline at this time to entertain the motion, or to recognize the right of a party to challenge our judgment upon the propriety of so doing in advance of the argument of the case upon its merits. The motion to certify certain questions to the Supreme Court is overruled."

A petition to the Supreme Court for certiorari in the Andrews Case was denied. 166 U. S. 721, 17 Sup. Ct. 996, 41 L. Ed. 1188.

Second. It is only in cases of grave doubt that questions should be certified to the Supreme Court. Fabre v. Cunard Steamship Co., 8 C. C. A. 199, 59 Fed. 500; the Horace B. Parker, 20 C. C. A. 572, 74 Fed. 640. The questions involved in this case are not of that nature.

The motion for a rehearing, as well as the petition to certify the question of jurisdiction to the Supreme Court, is overruled.