UNITED STATES v. UNITED SHOE MACHINERY CO. et al.

(District Court, E. D. Missouri.   June 6, 1916.)

1. EQUITY ⬤⇒153—PLEADING ⬤⇒34(1)—LIBERAL CONSTRUCTION OF PLEAD-
    INGS.
        In modern practice, pleadings in civil actions at law or in equity, are
    not construed with the strictness formerly applied to criminal indict-
    ments, but are to be taken to mean what their language fairly imports.
        [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 386–389; Dec.
    Dig. ⬤⇒153; Pleading, Cent. Dig. §§ 66, 67, 71; Dec. Dig. ⬤⇒34(1).]

2. EQUITY ⬤⇒362—PLEADING—SUFFICIENCY OF BILL.
        In the federal courts of equity, indefiniteness of statement in a bill is
    not ground for a motion to dismiss, if, fairly construed, it states a cause
    of action; but the defendant has an adequate remedy under equity rule
    20 (198 Fed. xxiv, 115 C. C. A. xxiv) by motion for more particular state-
    ment.
        [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 758–761; Dec.
    Dig. ⬤⇒362.]

3. EQUITY ⬤⇒141(1)—PLEADING—PLEADING WRITTEN INSTRUMENTS.
        Instruments of writing need not be set out in extenso in a bill, unless
    the bill shows that it is essential to the proper construction of the par-
    ticular clauses complained of, and, which are set out.
        [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 323–330, 333; Dec.
    Dig. ⬤⇒141(1).]

4. MONOPOLIES ⬤⇒24(2)—SUIT UNDER CLAYTON ANTI-TRUST ACT—PARTIES.
        To a suit by the United States to have leases of shoe machinery ex-
    acted by defendants from shoe manufacturers adjudged illegal, as in vio-
    lation of Clayton Act Oct. 15, 1914, c. 323, § 3, 38 Stat. 731, because of
    provisions therein intended to prevent competition and to secure a mo-
    nopoly by virtually compelling the lessees to purchase or lease other ma-
    chines from defendants and preventing them from purchasing or using
    machines made by competitors of defendants, and to enjoin the further
    making or enforcement of leases containing such provisions, the lessees
    are not necessary parties; no relief being asked against them.
        [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig.
    ⬤⇒24(2).]

5. EQUITY ⬤⇒94—JURISDICTION OF FEDERAL COURTS—PARTIES.
        The failure to join one who is a proper, but neither a necessary nor an
    indispensable, party does not deprive a federal court of equity of jurisdic-
    tion.
        [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 246, 252; Dec.
    Dig. ⬤⇒94.]

6. CORPORATIONS ⬤⇒380—LIABILITY FOR CORPORATE ACTS—SUBSIDIARY COR-
    PORATONS.
        Where one corporation owns all of the stock of another and controls its
    policy and business, it is responsible for the acts of the subsidiary cor-
    poration, which are considered in equity as its own acts.
        [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1540; Dec.
    Dig. ⬤⇒380.]

7. MONOPOLIES ⬤⇒24(2)—CLAYTON ANTI-TRUST ACT—SUIT FOR VIOLATION—
    PARTIES.
        All of the stock of one corporation was owned by a second, and 98½
    per cent. of the stock of the second was owned by a third, and all three

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

had for the most part the same officers and directors. *Held* that, in a suit by the United States for violation of Clayton Act Oct. 15, 1914, c. 323, 38 Stat. 730, by the first corporation, the other two corporations were properly joined as defendants.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ⊚══24(2).]

8. CONSTITUTIONAL LAW ⊚══48—STATUTES—DETERMINATION OF VALIDITY—PRESUMPTION IN FAVOR OF VALIDITY.

A federal statute will not be declared void by the courts, unless it appears beyond a reasonable doubt that it is not within the constitutional powers of Congress.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 46; Dec. Dig. ⊚══48; Statutes, Cent. Dig. § 56.]

9. COMMERCE ⊚══16—"INTERSTATE COMMERCE"—LEASING OF MACHINES.

The fact that every lease is not commerce is not conclusive that none may be, and where a large corporation, doing an interstate business amounting to millions of dollars annually in disposing of machinery which it manufactures, sees proper to lease instead of sell its machines, it is no less engaged in interstate commerce than it would be if it sold the machines, and its lease contracts are proper subjects of Congressional regulation.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 2; Dec. Dig. ⊚══16.

For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

10. MONOPOLIES ⊚══10—CLAYTON ANTI-TRUST ACT—CONSTITUTIONALITY.

Clayton Act Oct. 15, 1914, c. 323, § 3, 38 Stat. 731, making it unlawful for any person engaged in commerce, in the course of such commerce, to lease or sell goods, machinery, etc., on any condition, agreement, or understanding that the lessee or purchaser shall not use or deal in goods or machinery of a competitor of the lessor or seller, where the effect may be to substantially lessen competition or tend to create a monopoly, as applied to leases made in the conduct of interstate business, is within the constitutional power of Congress.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 9; Dec. Dig. ⊚══10.]

11. STATUTES ⊚══216—CONSTRUCTION—EXTRINSIC AIDS.

It is only when an act of Congress is ambiguous that the debates when it was under consideration may be resorted to in aid of its construction; where the language is clear, it is controlling and conclusive.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 292; Dec. Dig. ⊚══216.]

12. MONOPOLIES ⊚══24(2)—SUIT FOR VIOLATION OF CLAYTON ACT—SUFFICIENCY OF BILL.

A bill alleging that the corporation defendants made leases of shoe machinery to manufacturers for use throughout the United States which contained provisions prohibiting the lessees from purchasing or using machines of other makers under penalty of increased rental, or of the cancellation of leases under which indispensable machines not otherwise obtainable were in use, *held* to state a cause of action for violation of Clayton Act Oct. 15, 1914, c. 323, § 3, 38 Stat. 731, although it was not alleged that the lessees expressly bound themselves to observe such restrictions.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ⊚══24(2).]

⊚══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

13. MONOPOLIES ☜24(2)—SUIT FOR VIOLATION OF CLAYTON ACT—SUFFICIENCY OF BILL.

Such a bill, if it charges the doing of acts by the defendants which are in terms made unlawful by the act, and that such acts tend to substantially lessen competition and to create a monopoly, is not insufficient because it does not allege that they were "unduly and improperly exercised."

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ☜24(2).]

14. CONSTITUTIONAL LAW ☜27—OBLIGATION OF CONTRACTS—POWERS OF CONGRESS.

The constitutional provision prohibiting the states from passing laws impairing the obligations of contracts is not a limitation upon the powers of Congress, to which it has no application.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 31; Dec. Dig. ☜27.]

In Equity. Suit by the United States against the United Shoe Machinery Company and others. On motion to dismiss. Denied.

See, also, 227 Fed. 507.

This is an action to enjoin the defendants, the United Shoe Machinery Company, a corporation existing under the laws of the state of Maine, the United Shoe Machinery Company, a corporation existing under the laws of the state of New Jersey, the United Shoe Machinery Corporation, also existing under the laws of the state of New Jersey, and certain individuals, alleged to be the directors and officers of these corporations, from enforcing, or attempting to enforce, certain provisions of leases alleged to be prohibited by section 3 of the act of Congress approved October 15, 1914, 38 Stat. 730, known as the "Clayton Act." For convenience the defendant United Shoe Machinery Company of Maine will be referred to in this opinion as the "Maine Company," the United Shoe Machinery Company of New Jersey as the "New Jersey Company," and the United Shoe Machinery Corporation as the "corporation." ˙

The complaint is brief and concise, and will be practically set out in full. It charges: That the Maine Company is a corporation organized under the laws of the state of Maine, with an authorized capital stock of $3,000,000. Its original corporate name was "Goodyear Shoe Machinery Company." All of its capital stock, assets, and business were acquired in 1889 by the United Shoe Machinery Company of New Jersey, which now owns the same. That in 1902 the name of the "Goodyear Shoe Machinery Company" was changed to "United Shoe Machinery Company," and, while it continues its corporate existence, it is merely a selling and leasing department of the New Jersey Company. It is the only one of the defendants which does business in the Eastern district of Missouri. That the officers and directors of all three companies are in effect the same. That the New Jersey Company has a capital stock of $20,850,-519, all of which is substantially owned by the defendant the United Shoe Machinery Corporation. That ever since its incorporation it has been engaged in manufacturing, selling, and leasing shoe machinery, and it is the operating company of the business followed by the defendants. Its chief manufacturing plant is at Beverly, Mass., and its officers and directors are, for the most part, the same as those of the other corporate defendants. That the corporation has an authorized capital stock of $50,000,000, and is empowered by its charter to engage in manufacturing, selling, and leasing shoe machinery, but its activities have been confined chiefly to those of a holding company. Shortly after its organization it acquired and now owns 98½ per cent. of the outstanding capital stock of the New Jersey Company and through this company dominates the other corporate defendants. In addition it controls the stock of certain other affiliated corporations, engaged in business related to the shoe machinery interest. That the defendant Sidney M. Winslow is president, director, and

managing officer of all these three corporations, and numerous other corporations owned and subsidiary corporate defendants, and the other individual defendants are officers and directors, some of all three corporations, and others of two of the defendant corporations. That the defendants have leased, sold, and are leasing and selling their machinery, supplies, and repairs, and in certain instances have fixed and are fixing the prices thereof, and discounts and rebates from such prices, on condition, agreement, and understanding that the lessee or purchaser shall not use the machinery, supplies, or other commodities of competitors of the lessors, which agreements tend to create a monopoly in that branch of interstate commerce which relates to the shoe machinery business.

The bill then alleges: That nearly all shoes now made in the United States are manufactured by machinery. Over 1,500 manufacturers are engaged in cities and towns of nearly every state in the Union in the production, annually, of more than 300,000,000 pairs of machine-made shoes. With all but a very few of these manufacturers the defendants have business relations. That the defendants devote themselves particularly to the production of machinery used in preparing and stitching soles to the uppers of shoes. They also manufacture machinery used in other shoe-making operations. That the defendants divide certain of their important machines into two classes, "principal" and "auxiliary." In a general way machines which perform operations of major importance are spoken of as "principal" while machines which execute operations necessary to the work of "principal" machines are called "auxiliary." The distinction, however, it is charged, is largely arbitrary, and results chiefly from the defendants' system of leasing. Many of the more important machines are put out by the defendants on leases. On some the lessees are required to pay royalties, and on others an annual rental. All machines on which royalties are exacted are designated as "principal," and all those on which an annual rental is paid "auxiliary."

The cutting of the soles, uppers, and lining, and the stitching of the uppers and lining, follow about the same course with respect to all kinds of shoes. It is when the sole comes to be attached to the upper of the shoe—"bottomed," as it is called in the trade—that the fundamental difference in construction arises. Here two chief categories appear: In the one the soles are fastened by thread; the other, by wire, nails, or wooden pegs. The first category is subdivided into three classes: (A) McKay sewed; (B) turned; (C) welt shoes. The second category is divided into two classes: (a) Metallic fastened; (b) pegged shoes. The McKay sewed shoe is so called because it is bottomed on a McKay sewing machine; the turned shoe takes its name from the fact that it is turned inside out during the process of attaching the sole, which is done on a welt and turn sewing machine; the welt shoe is so designated because a narrow strip of leather, called a welt, is sewed to the upper and insole, by a welt sewing machine, and the outsole is attached to the welt by an outsole stitching machine. Metallic fastened shoes have their soles attached to the insoles on a "loose nailer," or by wire screws on a "standard screw" machine; pegged soles are bottomed on a "pegging" machine. In connection with the working of these machines are certain accessory operations which are executed for the most part by "auxiliary" machines. The bill then describes how this work is done. It is then charged that "principal" machines cannot be operated profitably without the use of some, if not all, of the "auxiliary" machines. The "auxiliary" machines are of substantially no value, except as they are used in connection with the "principal" machines.

The illegal actions of which complaint is made are described as follows: The writings under which the defendants put out most of their machinery are variously designated "ordinary and temporary lease and agreement," "lease and agreement," "lease and license agreement," or "agreement," but are in the bill referred to as leases. Under these leases it is charged the defendants ship, and for many years have been shipping, in interstate and foreign commerce, the shoe machinery and supplies herein referred to, from Beverly, Mass., to points in other states and foreign countries. The leases generally run for a period of 17 years. Many of them were made before, and some since, the passage of the Clayton Act, but all are now being enforced by the

defendants. The bill does not complain of the leases as a whole, but only parts thereof, which are described in the bill as "tying clauses" and "discounts and rebates." The bill charges that in each of the leases there are certain provisions denominated the "tying clauses," because they tie together the uses of several leased machines, and in effect, though not always in terms, prohibit the lessees from using machines of lessor's competitors. For example, the fastening machines may not be used on any shoe not welted, stitched, slugged, heeled, or seat-nailed on machinery leased from the defendants. In other words, machines are "tied" in a similar manner. The tying clauses provide in substance that the lessee: (1) Shall not use machinery in the manufacture or preparation of footwear which has not had certain essential operations performed upon it by other machines leased from the lessor. (2) Shall use the leased machinery to its full capacity. (3) Shall use exclusively the leased machinery for the class of work for which it is designed. (4) Shall obtain from the lessor exclusively, at such prices as it may establish, all duplicate parts, mechanisms, or repairs needed in operating the leased machines, and all supplies needed in connection with them. (5) Shall use patented insoles made on defendants' machinery only in connection with certain footwear manufactured by machinery leased from the lessor. (6) Shall lease from the lessor any additional machinery which he may need for work in the same department as that of the machine leased. (7) Shall permit the lessor to determine whether the lessee has in his factory more machinery adapted for doing the same work than he needs, and, if so, to remove such machines as, in the opinion of the lessor, are unnecessary. (8) Shall, at the election of the lessor, suffer a termination of all leases which he may have, and the removal of all machines leased by him from the defendants, in the event of any violation of any term of any one of the leases.

Copies of the clauses above referred to are attached to the bill as Exhibits 1, 2, 3, 4, 5, 6, 7, and 8.

### Exhibit 1.

The leased machinery shall be used for no other purpose than for lasting boots, shoes, or other footwear made by or for the lessee. The leased machinery shall not, nor shall any part thereof, be used in the manufacture or preparation of any welted boots, shoes, or other footwear, or portions thereof, which have been or shall be welted in whole or in part, or the soles in whole or in part stitched, by the aid of any welt-sewing or sole-stitching machinery not held by the lessee under lease from the lessor, or in the manufacture or preparation of any turned boots, shoes, or other footwear or portions thereof the soles of which have been or shall be in whole or in part attached to their uppers by the aid of any turn-sewing machinery not held by the lessee under lease from the lessor, or in the manufacture of any boots, shoes, or other footwear which have or shall be in whole or in part pulled-over, slugged, heel seat-nailed, or otherwise partly made by the aid of any pulling-over or "metallic" machinery not held by the lessee under lease from the lessor.

### Exhibit 2.

Subject to the foregoing limitations, the lessee shall use the leased machinery to its full capacity upon all boots, shoes, or other footwear, or portions thereof, made by or for the lessee in the manufacture or preparation of which such machinery is capable of being used.

### Exhibit 3.

If at any time the lessee shall fail or cease to use exclusively lasting machinery held by him under lease from the lessor for lasting boots, shoes, and other footwear made by him or for him, which are lasted by the aid of machinery, or shall fail or cease to use exclusively tacking mechanisms and appliances held by him under lease from the lessor for doing all work in the manufacture of all boots, shoes, and other footwear made by or for him which is done by the aid of tacking mechanisms and appliances, the lessor, although it may have waived or ignored prior instances of such failure or cessation, may, at its option, terminate forthwith, by notice in writing, any or all leases or licenses of lasting machines, lasting machinery, lasting mechanisms, or lasting devices then existing between the lessor and the lessee, whether as the result of assignment to the lessor or otherwise; and the possession of and full right to and control of all lasting machines, lasting machinery, and lasting mechanisms shall thereupon revest in the lessor free from all claims and demands whatsoever.

### Exhibit 4.

The lessee shall obtain from the lessor exclusively, and shall pay therefor at the regular prices from time to time established by the lessor, all the duplicate parts, extras, mechanisms, and devices of every kind needed or used in operating, repairing, or renewing the leased machinery, and the same shall form part of the leased machinery, and the lessee shall not otherwise make or allow to be made any addition, subtraction, or alteration to, from, or in the leased machinery without the consent in writing of the lessor, nor interfere with the proper operation of the same. The lessee shall also purchase from the lessor exclusively, at the prices from time to time established by the lessor, all supplies, including string nail, tack strips, and other fastening materials used in connection with the lasting machinery.

### Exhibit 5.

The leased machinery shall be used only in the manufacture or preparation of reinforced insoles which embody the inventions patented in letters patent of the United States of America, No. 849,245, dated April 2, 1907, owned by the lessor, for use in welted boots, shoes, and other footwear known in the trade as "Goodyear welts," which have been or are to be welted wholly by Goodyear welt and turn shoe machines or Goodyear inseam sewing machines held by the lessee under lease from the lessor, and the soles of which have been or are to be attached to their welts wholly by Goodyear outsole rapid lockstitch machines held by the lessee under lease from the lessor, or for use as insoles or soles of turned boots, shoes, and other footwear known in the trade as "Goodyear turns," the soles of which have been or are to be attached to their uppers by Goodyear welt and turn shoe machines or Goodyear Universal inseam sewing machines held by the lessee under lease from the lessor, and in the manufacture or preparation of such patented insoles (or soles) the lessee shall use the principal machinery hereby leased to its full capacity so far as the lessee uses reinforced insoles (or soles) in the manufacture of such footwear. The auxiliary machinery hereby leased shall be used only in the manufacture or preparation of said patented insoles (or soles) which have been or are to be reinforced wholly by an Economy insole reinforcing machine hereby leased or held by the lessee under other leases and license from the lessor.

6. The lessee is hereby licensed under letters patent of the United States, No. 849,245, dated April 2, 1907, to manufacture by the use of the principal machinery hereby leased during the continuance in force of this lease and license the patented insoles covered by said letters patent and to use such patented insoles so made by the lessee in the manufacture of welted or turned boots, shoes, or other footwear which have been or are to be manufactured as provided in article 5 hereof.

### Exhibit 6.

In case the lessee has more work of the kind which can be performed by any of the machines belonging to the metallic department of the lessor than the capacity of the metallic machinery which he has under lease from the lessor will permit, then the lessee shall either take from the lessor, under a like lease and agreement, sufficient and additional machinery to perform the work, or in case the lessee does not thus lease additional metallic machinery from the lessor, then the lessor may, if it so elects, cancel forthwith this lease and any other lease of metallic machinery then in force between the lessor and the lessee, whether as the result of assignment or otherwise.

### Exhibit 7.

12. In case the lessee, at any time, shall have in his factory more machines adapted for doing the same work as any machine or machines hereby leased than in the opinion of the lessor are sufficient for performing the work which the lessee has in his factory, based upon the capacity of such machines and the number and kind of boots, shoes and other footwear made by the lessee for any period of twelve (12) consecutive months next preceding, the lessor may, at its option, upon thirty (30) days' notice in writing to the lessee, terminate the lease and license herein contained and in respect to such of the said machines as in the opinion of the lessor are unnecessary.

### Exhibit 8.

This lease and license shall continue, unless sooner terminated by the lessor as herein provided for seventeen years from the date hereof. But if any breach or default shall be made in the observance of any one or more of the conditions contained herein or contained in any other lease or license agreement existing between the lessor and the lessee, whether as the result of assignment to the lessor or otherwise and expressed to be obligatory upon the lessee, the lessor shall have the right by notice in writing to the lessee to terminate forthwith any and all leases of or licenses to use machinery then in force between the lessor and the lessee, whether as the result of assignment to

the lessor, or otherwise, and this notwithstanding that previous breaches or defaults may have been unnoticed, waived or condoned by or on behalf of the lessor.

The bill then charges that competitors of defendants have produced, sold, and leased, and are now producing, selling, and leasing, in interstate commerce, machines similar in function to many important machines put out by the defendants and affected by the "tying clauses" herein described. Exhibit 13 to the complaint is a list showing the different machines used in the manufacture of shoes showing, in one column, how many of these different machines are put out to shoe manufacturers in the United States by the defendants, and in another column by all other shoe machinery manufacturers in the United States.

Exhibit 13.

Machines Put Out to Shoe Manufacturers in the United States.

|  | By Defendants. | By All Others. |
|---|---|---|
| Clicking machine | 3,655 | None |
| Eyeletting machine | 4,472 | 150 |
| Pulling-over machine | (1) | (1) |
| Lasting machine | 7,496 | 7 |
| Standard screw machine | (1) | (1) |
| Pegging machine | (1) | (1) |
| Tacking machine | 3,488 | 6 |
| McKay sewing machine | 893 | 8 |
| Welt sewing machine | 2,527 | 142 |
| Outsole stitching machine | 2,676 | 758 |
| Loose-nailing machine | 1,835 | 24 |
| Heeling machine | 2,019 | 17 |
| Slugging machine | 1,876 | 23 |

(1) No competition in the United States.

In nearly all cases where shoe manufacturers have used or are using any machines procured from competitors of the defendants, the latter have threatened and do now threaten to remove from the factories of the said manufacturers, all machines leased from them. In some cases the defendants have removed the machines, and in other instances have imposed heavy penalties upon manufacturers because of the use of such machines, secured from defendants' competitors in violation of said "tying clauses." That some of these competitors of the defendants are prepared to supply certain machines of the kinds referred to, as well as other machines adapted to the making of shoes, at prices much less and on terms more favorable than those exacted by the defendants for similar machines, and shoe manufacturers desire to procure them, but are deterred from doing so by the "tying clauses," and from fear of the severe financial consequences that would follow their violation. Besides, competitors of the defendants, other than those now in existence, would arise, and other shoe-making machines would be manufactured and put out by them, if the field of competition was free from the restraining effect of said "tying clauses."

Some indispensable machines can be obtained only from the defendants, for example, the stitch indenter and burnisher. In the lease under which the defendants put out these machines, they tie their use to other machines which they manufacture, and thereby compel the lessees to procure all such other machines from the defendants, the effect of which is practically to prohibit the shoe manufacturers from obtaining any such other machines from competitors of the defendants. That some leases put out by the defendants have clauses which provide for a discount or rebate on prices fixed for the use of the machines rented—in certain contingencies eliminating the price entirely—in consideration of the lessees using other machines of the defendants. Copies of these clauses are filed as Exhibits 9, 10, 11, and 12.

Exhibit 9.

6. The lessee shall pay to the lessor throughout the full term of this agreement the respective amounts set forth in the following schedule in respect to each pair of welted

boots, shoes, or other footwear, or portions thereof, manufactured or prepared by or for the lessees, which shall have been welted in whole or in part or the soles of which shall have been in whole or in part attached to welts by the use of any welting or stitching or sewing machinery, and in respect to each pair of "turned" boots, shoes, or other footwear, or portions thereof, manufactured or prepared by or for the lessee, the soles of which shall have been sewed or attached to their uppers, in whole or in part by the use of any sewing or stitching machinery, viz.:

Schedule of Payments per Pair.

|  | Sizes, Form Nos. ——. | Welts. Cents. | Turns. Cents. |
|---|---|---|---|
| Children's | 1 to 10½ inclusive | 3 | 1 |
| Misses' | 11 to 2 inclusive | 4 | 1½ |
| Women's | 2½ and over | 6 | 1½ |
| Boys' | 9 to 13 inclusive | 4 | 1½ |
| Youths' | 1 to 5 inclusive | 6 | 1½ |
| Men's | 5½ and over | 8 | 1½ |

All payments and the guaranty in this agreement provided for are independent of and in addition to all payments and guaranties provided for in any other leases or licenses or agreements between the lessor and the lessee: Provided, however, that (excepting in so far as is required by the guaranty herein contained or contained in other lease and license agreements between the lessor and the lessee), in case under any other "Goodyear department" lease and license agreement between the lessor and the lessee covering one or more Goodyear welt and turn shoe machines, Goodyear Universal inseam sewing machines, or Goodyear outsole rapid lock-stitch machines, the lessees shall have paid to the lessor the amount set forth in the schedule of payments in such lease and license agreement contained in respect to any pair of boots, shoes, or other footwear, then the lessee shall be relieved from said payment hereunder in respect to that pair of boots, shoes, or other footwear.

### Exhibit 10.

### Order and Temporary Loan Agreement, No. 236 "A."

8. The licensee, until such time as he shall have redelivered all of said machinery to the United Company, as hereinafter provided, shall pay to the United Company the sum of one-half of one cent (½¢) in respect to each and every pair of boots, shoes or other footwear, or portions thereof, manufactured and prepared in said factory or in any factory to which any of the said machinery shall be removed which have been pulled over in any way, whether wholly or in part, by the aid of machinery, whether or not of the United Company; and the licensee shall also pay to the United Company in respect to each pair of boots, shoes, or other footwear, or portions thereof, in the manufacture or preparation of which any machine hereby leased is used, the sum of one-quarter of one cent (¼¢) for each machine so used: Provided, however, that the total of the payments required to be made under this article hereof or under the corresponding article of any other pulling-over department lease or license agreement or agreements heretofore executed between the lessee and the United Company shall not exceed such amount as shall make the total of such payments for such factory and of the payments for such factory required to be made under the corresponding article of any lease or license agreement or agreements between the licensee and the United Company covering lasting machines equal to a payment in respect to the total number of pairs of footwear made in whole or in part in such factory at the following rates, viz.:

In respect to all footwear lasted by machines held by the licensee under lease or license agreement from the United Company an amount for each pair three-fourths (¾) of one cent in excess of the amount required to be paid under the terms of the lease or license agreements covering such lasting machines.

In respect to all footwear not lasted by machines held by the licensee under lease or license agreement from the United Company one and three-fourths (1¾) cents for each pair of children's (sizes 1 to 10½ inclusive) or misses' (sizes 11 to 2 inclusive) footwear and two (2) cents for each pair of all other kinds, excepting alone that turned footwear in the manufacture of which no lasting machine shall be used shall in such computation be included at the rate of three-fourths (¾) of one cent per pair only.

### Exhibit 11.

9. The licensee shall pay to the United Company, in accordance with the following "Schedule of Payments," in respect to each pair of footwear made in said factory or in any factory to which any of the said machinery shall be removed, in the manu-

facture of which any one or more of the operations which can be performed by the machines of the metallic department of the United Company or any of them is performed by machinery, whether performed by machinery of the United Company or by other machines, viz.:

### Schedule of Payments.

|  | Per Pair. |
|---|---|
| For each pair of turned footwear in which no metallic fastening machine is used for attaching sole | ½¢ |
| For each pair of welted or slip soled or McKay sewed footwear in which no metallic fastening machine is used for attaching either a welt, slip sole, or outsole | 1¢ |
| For each pair of footwear the outsoles of which are attached by metallic fastenings | 3¢ |
| For each pair of footwear of all other kinds | 2¢ |

—excepting, however, that in the case of each pair of footwear in which all such metallic operations as are performed by machinery in the manufacture thereof are performed by metallic department machinery of the United Company, held by the licensee under lease or license agreement from the United Company, and in which all of the metallic materials inserted by such machinery are obtained from the United Company at the prices from time to time established by the United Company (which prices include not only the price for the materials themselves but also an additional amount as royalty for the use of the machines by which the same are inserted), such payment in accordance with the foregoing "Schedule of Payments" shall not be required to be made.

[The words "United Company" appearing in the above exhibits refer to one of the corporate defendants.]

### Exhibit 12.

Four. The lessee, as rent and royalty for the leased machinery, shall purchase exclusively of the lessor all the fastening material used by him in connection with the leased machinery, and shall pay the lessor in cash on delivery the regular and uniform prices therefor as established from time to time by the lessor, which shall not be more than ten (10) per cent. in excess of the prices to be established from time to time by the lessor for like fastening material to be used in its metallic department machinery by lessees who shall agree not to use the metallic department machinery leased to them in the manufacture of boots and shoes which are lasted on machines other than those leased from the lessor, or of welted boots, or shoes which are not welted and stitched on welt sewing and sole stitching machines leased from the lessor, or turned shoes the soles of which are not attached by turn sewing machines leased from the lessor.

Some of the machines are leased by the defendants on what they call an "unrestricted" form of lease. Under that form the lessee in certain cases is permitted to use with the machine leased from the defendants machinery obtained from the competitors of the defendants. These "unrestricted" leases involve the payment of certain "initial premiums" which have remained the same for many years. These "initial premiums" are in addition to the royalties and other charges, which are the same as under the "restricted" form of lease. The amounts of these "initial premiums" are so large as to practically prohibit the choice of the "unrestricted" form. It is charged that these premiums would amount to about $250,000 upon the machinery in a factory having an output of 25,000 to 30,000 pairs of shoes daily.

The bill then sets out how the defendants obtained control of the shoe machinery business, by charging that the New Jersey Company, soon after its organization, acquired and still owns the capital stock of the Goodyear Machinery Company, Goodyear Machinery Company of Canada, the International Goodyear Machinery Company, Consolidated & McKay Lasting Machine Company, McKay Shoe Machinery Company, and Eppler Welt Machine Company, all of which companies were, at the time they were so acquired, engaged in the business of manufacturing, selling, and leasing, and otherwise dealing in shoe machinery; that these companies conveyed to the New Jersey Company all of their business, including letters patent of the United States and all other countries. Afterwards from time to time this corporation secured and still maintains control of 56 other concerns engaged in the manufacture, sale, and leasing of some form of shoe machinery, or supplies, thereby controlling a complete line of "principal" and "auxiliary" machinery used in the bottoming of shoes. Before then no one company could supply such a line, nor can any company do so now outside the defendants. By reason of this

control the defendants make the unlawful lease clauses set out in the complaint, whereby shoe manufacturers are prohibited from using in the bottoming of shoes machinery or supplies of defendants' competitors, and to this cause is due the fact that the defendants control as they do 98½ per cent. of the shoe machinery business of the United States, as shown by Exhibit 13.

The prayer of the bill is that the clauses of the leases hereinbefore referred to, and all clauses of like tenor and effect, and the conditions, agreements, and understandings upon which the leases were made, as aforementioned, be declared illegal and void under the said Clayton Act, and that the defendants be enjoined from enforcing or attempting to enforce the same, and from making any similar clauses or leases upon like conditions, agreements, or understandings in the future.

The defendants have filed motions to dismiss the complaint, assigning 20 causes. As many of these are mere repetitions, and as the grounds relied on by the defendants will be referred to in the opinion, it is unnecessary to set them out in this statement of facts.

Constantine J. Smyth and H. La Rue Brown, Sp. Asst. Attys. Gen., for the United States.

Charles F. Choate, Jr., of Boston, Mass., Chester H. Krum, of St. Louis, Mo., Cordenio A. Severance, of St. Paul, Minn., and Frederick P. Fish, of Boston, Mass., for defendants.

TRIEBER, District Judge (after stating the facts as above). Section 3 of the Clayton Act, which was invoked as the basis for this action, is as follows:

"Sec. 3. That it shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, whether patented or unpatented, for use, consumption or resale within the United States or any territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

We will first dispose of those grounds of the motion which affect the pleadings only.

[1] It is claimed that the allegations in the complaint are not specific enough to enable the court to determine whether the acts charged are within the meaning of the statute, nor sufficient to enable the defendants to prepare their defense.

Counsel in their arguments, as well as in their briefs, stated their position as follows:

"In any pleading, whether criminal, at law, or in equity, the thing charged should be stated with such precision and certainty that the defendant may know with what he is charged, that he may prepare his defense, and so that the court may be able to determine whether the offense charged is within the provisions of the statute."

While this rule is applied to indictments in criminal proceedings, the rule in civil actions, either at law or in equity, is much more liberal. Mr. Justice Holmes, delivering the opinion of the court in Swift

& Co. v. United States, 196 U. S. 375, 395, 25 Sup. Ct. 276, 279 (49 L. Ed. 518), which was an action under the Sherman Anti-Trust Act, held:

"Whatever may be thought concerning the proper construction of the statute, a bill in equity is not to be read and construed as an indictment would have been read and construed 100 years ago, but it is to be taken to mean what it fairly conveys to a dispassionate reader by a fairly exact use of the English speech."

Nor does the old rule, that "every intendment is against the pleader, and therefore the pleadings must be strictly construed against him," govern the courts at this day; but, on the contrary, the courts now recognize the fact that it is of more importance to determine issues than pleadings, provided, of course, the facts alleged in the complaint entitle the plaintiff to the relief sought.

[2] The new equity rules, which in effect are similar to the Code procedure prevailing in most of the states, are clearly intended to simplify pleadings and do away with many of the technicalities theretofore required. That under the Codes a demurrer upon mere technical grounds would not lie, but that the proper remedy is a motion to make the complaint more specific, is now well settled. 4 Standard Enc. of Procedure, 859; Bliss on Code Pleading (3d Ed.) § 425A; McAllister v. Kuhn, 96 U. S. 87, 24 L. Ed. 615; United States v. Parker, 120 U. S. 89, 94, 7 Sup. Ct. 454, 30 L. Ed. 601; Singers-Biggers v. Young, 166 Fed. 82, 91 C. C. A. 510; Locker v. American Tobacco Co. (D. C.) 194 Fed. 232; Phillips v. Jones, 79 Ark. 100, 104, 95 S. W. 164, 9 Ann. Cas. 131; Sanders v. Carpenter, 102 Ark. 187, 190, 143 S. W. 1091. Equity rule 20 (198 Fed. xxiv, 115 C. C. A. xxiv) offers the defendants an adequate remedy, if the allegations in the complaint are not specific enough to enable them to prepare their defense.

Even under the old rule general certainty only was required in pleadings in equity. St. Louis v. Knapp Co., 104 U. S. 658, 661, 26 L. Ed. 883. Only when the uncertainty in the pleadings is of such a nature that it does not state a cause of action will a demurrer, or, under the present equity rules, a motion to dismiss, lie. The complaint does not lack that certainty which is necessary to enable the court to determine whether it states a cause of action; nor can it be said that the allegations are too uncertain to enable the defendants to prepare their defense.

It sets out as fully as is necessary for a proper defense what the plaintiff expects to rely on, and therefore enables the defendants to prepare their defense. To a similar objection made in Swift & Co. v. United States, supra, which, as stated before, was an action under the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209), Mr. Justice Holmes replied:

"This objection is serious, but it seems to us inherent in the nature of the case. The scheme alleged is so vast that it presents a new problem in pleading. If, as we must assume, the scheme is entertained, it is, of course, contrary to the very words of the statute. Its size makes the violation of the law more conspicuous, and yet the same thing makes it impossible to fasten the principal fact to a certain time and place. The elements, too, are so numerous

and shifting, even the constituent parts alleged are and from their nature must be so extensive in time and space, that something of the same impossibility applies to them. The law has been upheld, and therefore we are bound to enforce it, notwithstanding these difficulties."

The complaint in this case is drawn in concise terms and, without repetitions and unnecessary verbiage, states the facts which the pleader claims show that the plaintiff is entitled to relief under the Clayton Act. The failure to set out the leases in full only tends to reduce the size of the record, as the complaint expressly alleges that only the parts set out in the exhibits are contrary to the statute, and only as to them is relief sought. If other provisions of the leases would show that these excerpts are misleading, that the lease as a whole would show a different state of facts than is alleged in the complaint, they may be set out in full in the answer, as counsel during the argument admitted that they had the original leases in their possession; or, if they believe that with the entire leases before the court it would appear that they are not subject to the construction put upon the clauses set forth in the complaint, and that they do not violate any statute of the United States, a motion under equity rule 20 would give them all the relief needed. This rule is a copy of the English chancery rule (Order XIX, rule 7), and as stated in Spedding v. Fitzpatrick, 38 C. D. 413:

"The bill of particulars is to enable the party asking for them to know what case he has to meet at the trial, and to save unnecessary expense and avoid allowing parties to be taken by surprise."

[3] In the opinion of the court instruments of writing need not be set out in extenso in the pleadings, unless the bill shows that it is essential to a proper construction of the particular clauses complained of. Such is not the case here.

[4] *Is the petition defective for failing to make the lessees defendants?*

The leading authority upon which the defense relies to sustain this ground of their motion is Minnesota v. Northern Securities Co., 184 U. S. 199, 22 Sup. Ct. 308, 46 L. Ed. 499. But the facts in that case differ so materially from those set out in the plaintiff's bill that it is wholly inapplicable to the instant case. In that case the state of Minnesota brought suit to enjoin the Northern Securities Company from exercising any control in the management or operation of two separate railways, existing under the laws of the state of Minnesota, which it was charged it attempted to do by reason of the ownership and control of the majority of the stock of the two railways and numerous other roads controlled by these railways, by virtue of stock ownership, and in violation of the laws of the state of Minnesota. Mr. Justice Shiras, delivering the opinion of the court, stated the object of the bill to be:

"The narrative of the bill unquestionably disclosed that the parties to be affected by the decision of the controversy are, directly, the state of Minnesota, the Great Northern Railway Company, the Northern Pacific Railway Company, corporations of that state, and the Northern Securities Company, a corporation of the state of New Jersey, and, indirectly, the stockholders and bondholders of these corporations, and the numerous railway companies whose lines are alleged to be owned, managed, and controlled by the Great Northern

and Northern Pacific Railway Companies. * * * But it is not alleged that the stockholders of the Northern Securities Company constitute or are composed of all the stockholders of the two railroad companies, and, in fact, the contrary is conceded in the allegations of the bill that a majority only of the stock of one, or perhaps both, of the two railroad companies is owned, or at least controlled and managed, by the Northern Securities Company."

Some of the relief prayed in the bill was that the Northern Securities Company, and its officers, be enjoined "from in any way aiding, advising, directing, interfering with, or in any way taking part, directly or indirectly, in any manner whatsoever, in the management, control, or operation of any of the lines of railway of either of said companies, * * * and from doing any and all acts and making any arrangements or combinations, by contract or otherwise, having for their object, effect, or result, the consolidation or establishment of a joint management or control in any manner whatsoever of the said Great Northern and Northern Pacific Railway Companies, their lines of railway or properties." No such relief is asked in this case, nor does the complaint seek the cancellation of any leases made by the defendants, but only to enjoin the enforcement of those clauses in the leases, which it is charged are prohibited by section 3 of the Clayton Act.

Shields v. Barrow, 58 U. S. (17 How.) 130, 15 L. Ed. 158, another case relied on by defendants, is wholly inapplicable to the facts in this case, as that was an action for the rescission of a compromise, and it was held that all the parties who, by the compromise sought to be rescinded, had been released of liability, were indispensable parties, as the object of the bill was to restore the plaintiff to his original rights as they existed before the compromise, and therefore would place upon these absent parties a liability of which they had been released by the compromise. It is hardly necessary to say, as it clearly appears from the language of the act, that the object of the statute invoked by the plaintiff was for the protection of the lessees and indirectly the public; Congress evidently presuming that the lessees accepted these leases under duress, and it is so charged in the complaint. It alleges:

"In the leases under which the defendants put out these machines they tie their use to other machines, which they manufacture, and thereby compel the lessees to procure all such other machines from the defendants, the effect of which is practically to prohibit the shoe manufacturers from obtaining any such other machines from competitors of the defendants."

And again:

"Competitors of the defendants have produced, sold, and leased, and are now producing, selling, and leasing, in interstate commerce machines similar in function to many of the important machines put out by the defendants and affected by the 'tying clauses' herein described. In nearly all cases where shoe manufacturers have used or are using lasting machines procured from competitors of the defendants, the latter have threatened, and do now threaten, to remove from the factories of said manufacturers, all machines leased from them. In some instances the defendants have removed such machines, and in other instances have imposed heavy penalties upon shoe manufacturers because of the use of such machines procured from the defendants' competitors in violation of said 'tying clauses.'"

[5] Aside from these allegations, it is expressly stated in the bill that no relief is sought against the lessees. What relief could the government ask against them? They are alleged to be bound hand and foot by these clauses in the leases, and must either submit to them, or do without those machines, which are under the absolute and sole control of the defendants, and if compelled to do without them, go out of business. Even if the lessees were proper parties, which is doubtful, the jurisdiction of the court would not be ousted for a failure to join them, as only indispensable parties, and in some instances necessary parties, must be joined. Cella v. Brown (C. C.) 136 Fed. 439; affirmed Id., 144 Fed. 742, 75 C. C. A. 608; O'Neil v. Wolcott Mining Co., 174 Fed. 527, 536, 98 C. C. A. 309, 318, 27 L. R. A. (N. S.) 200; Silver King, etc., Mines Co. v. Silver King C. M. Co., 204 Fed. 166, 122 C. C. A. 402; Lion Tractor Co. v. Bull Tractor Co., 231 Fed. 156, —— C. C. A. ——, opinion filed February 12, 1916.

An indispensable party has been defined as:

"When he has such an interest in the subject-matter of the controversy that a final decree cannot be rendered in the suit without injuriously affecting the absent party, or without leaving the controversy in such a situation that its final determination may be inconsistent with equity and good conscience." Rogers v. Penobscot Mining Co., 154 Fed. 606, 83 C. C. A. 380, and authorities there cited.

A necessary party is:

One who has "an interest in the controversy, and who ought to be made a party, in order that the court may act on that rule, which requires it to decide on and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it." Shields v. Barrow, supra.

No title to nor possession of property is involved in this case. Still, if any of the lessees believe that their interests may be injuriously affected by this action, they can apply to the court to be made parties, and the court will then determine whether leave to do so should be granted. So far none of the lessees has asked to be made a party. United States v. Du Pont De Nemours & Co. (C. C.) 188 Fed. 127. In the court's opinion the lessees are not indispensable nor necessary parties to this action, as the relief prayed in the bill, if granted, can in no wise affect them or their rights, except that it may relieve them of an onerous, and, as the complaint alleges, illegal, burden. Vetterlein v. Barnes, 124 U. S. 169, 8 Sup. Ct. 441, 31 L. Ed. 400.

[6, 7] *Are the New Jersey Company and the New Jersey Corporation improperly joined as defendants?*

It is urged that, as the Maine Company is the only defendant alleged to have made the leases complained of within the jurisdiction of this court, the other corporate defendants, each of whom has filed a separate motion to dismiss, are not proper parties. The allegations in the bill are that the entire capital stock of the Maine Company is owned by the New Jersey Company, and that the New Jersey Corporation owns 98½ per cent. of the capital stock of the New Jersey Company; that the officers and directors of the three corporations are practically the same, all of them serving as such officers and directors in at least two of the corporations, and some in all three. But it is claimed that

as each corporation is an entity, and as there is no charge of conspiracy, the mere fact that they are the owners of the capital stock of the Maine Company, the only offender, does not justify their being made parties defendants.

Whatever may have been the views of the courts in the early days of corporate existence, when there were but few corporations, and they mostly confined to business of a quasi public nature, at this date courts, and especially courts of equity, will look behind the corporate fiction, and if it clearly appears that one corporation is merely a creature of another, the latter holding all the stock of the former, thereby controlling it as effectively as it does itself, it will be treated as the practical owner of the corporation, when necessary for the purpose of doing justice. In McCaskill v. United States, 216 U. S. 504, 514, 30 Sup. Ct. 386, 391 (54 L. Ed. 590), Mr. Justice McKenna, delivering the opinion of the court, said:

"Undoubtedly a corporation is, in law, a person or entity entirely distinct from its stockholders and officers. It may have interest distinct from theirs. Their interests, it may be conceived, may be adverse to its interest, and hence has arisen against the presumption that their knowledge is its knowledge the counter presumption that in transactions with it, when their interest is adverse, their knowledge will not be attributed to it. But while this presumption should be enforced to protect the corporation, it should not be carried so far as to enable the corporation to become a means of fraud or a means to evade its responsibilities. A growing tendency is therefore exhibited in the courts to look beyond the corporate form to the purpose of it, and to the officers who are identified with that purpose. Illustrations are given of this in Cook on Corporations, §§ 663, 664, 727. The principle was enforced in this court in Simmons Creek Coal Co. v. Doran, 142 U. S. 417 [12 Sup. Ct. 239, 35 L. Ed. 1063]."

The same rule was recognized in Linn & Lane Timber Co. v. United States, 236 U. S. 574, 35 Sup. Ct. 440, 59 L. Ed. 725. In Miller & Lux v. East Side Canal Co., 221 U. S. 293, 29 Sup. Ct. 111, 53 L. Ed. 189, it was held that a plea that the plaintiff Miller & Lux, who instituted the action in a national court of the state of California, claiming to be a Nevada corporation, was organized under the laws of Nevada to act as the agent of Miller & Lux, a California corporation; that the California corporation owned all the capital stock of the Nevada corporation; that all the property of the Nevada corporation was held as agent for the California corporation, and that it had no other existence; that it was incorporated with the sole object to enable it to maintain suits in the national courts of California by reason of a diversity of citizenship; that it transacted no business except such as was necessary to carry out the performances of the California corporation; that therefore the Circuit Court should not retain jurisdiction of the cause, there being, in fact, no diversity of citizenship, both parties being citizens of the state of California—was rightly sustained by the Circuit Court, and its judgment affirmed by the Supreme Court. In Northern Securities Co. v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, Mr. Justice Harlan said:

"Necessarily by their combination or arrangement (referring to the Securities Company as holder of a majority of the shares of the constituent companies), the holding company in the fullest sense dominates the situation in

the interest of those who were stockholders of the constituent companies; as much so, for every practical purpose, as if it had been itself a railroad corporation which had built, owned, and operated both lines, for the exclusive benefit of its stockholders."

In the same case, when pending in the Circuit Court (120 Fed. 721, 725, 726), Judge Thayer, delivering the opinion of the court, in which Circuit Judges Caldwell and Sanborn concurred, said:

"It will not do to say that, so long as each railroad company has its own board of directors, they operate independently, and are not controlled by the owner of a majority of their stock. It is the common experience of mankind that the acts of corporations are dictated and that their policy is controlled by those who own the majority of their stock. Indeed, one of the favorite methods in these days, and about the only method, of obtaining control of a corporation, is to purchase the greater part of its stock. * * * The fact that the ownership of a majority of the capital stock of a corporation gives one the mastery and control of the corporation was distinctly recognized and declared in Pearsall v. Great Northern Railway, 161 U. S. 646, 671 [16 Sup. Ct. 705, 40 L. Ed. 838]," and numerous other cases cited in the opinion.

Referring to Pullman Car Co. v. Missouri Pacific Ry. Co., 115 U. S. 587, 6 Sup. Ct. 194, 29 L. Ed. 499, another case relied on by counsel for defendants, the same learned judge distinguished it by saying:

"In that case the meaning of the word 'controlled,' as used in a private contract, was the point under consideration, and what was said on the subject cannot be held applicable to cases arising under the Anti-Trust Act, when the point involved is whether the ownership of all of the stock of two competing and parallel railroads vests the owner thereof with the power to suppress competition between such roads. We entertain no doubt that it does. Indeed, we regard the suppression of competition, and to that extent a restraint of commerce, as the natural and inevitable result of such ownership."

In Chicago Mill & Lumber Co. v. Boatmen's Bank, 234 Fed. 41, —— C. C. A. ——, opinion filed April 27, 1916, Judge Adams, speaking for the Circuit Court of Appeals of this circuit, said:

"It is true that, apart from the question of ultra vires, not presently involved, when one corporation owns and controls the entire property of another, and operates its plant and conducts its business as a department of its own business, or as its alter ego, it is responsible for its obligations," citing a number of authorities.

In Re Rieger (D. C.) 157 Fed. 609, the court said:

"The doctrine of corporate entity is not so sacred that a court of equity, looking through forms to the substance of things, may not in a proper case ignore it and preserve the rights of innocent parties or to circumvent fraud."

In United States v. Milwaukee Refrigerator Transit Co. (C. C.) 142 Fed. 247, it was charged that the defendant was a dummy corporation, organized, owned, and operated by the stockholders of a brewing company, as a device to cover rebates on interstate shipments of beer, and the court held:

"A corporation, from one point of view, may be considered an entity, without regard to its shareholders, yet the fact remains self-evident that it is not in reality a person or thing distinct from its consistent parts. The word 'corporation' is but a collective name for the members who compose the association [citing authorities]. If any general rule can be laid down, in the present state of authority, it is that a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears;

but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons."

Of the many other cases to the same effect, see State ex rel. v. Standard Oil Co., 49 Ohio St. 137, 30 N. E. 279, 15 L. R. A. 145, 34 Am. St. Rep. 541; First National Bank v. F. C. Trebein Co., 59 Ohio St. 316, 52 N. E. 834.

From the allegations in the complaint it is beyond question that the Maine Company is merely a subsidiary of the New Jersey Company, and that both are under the absolute control, by reason of its stock ownership, of the New Jersey Corporation. The acts of one are the acts of all these corporations; in fact, it may truthfully be said that they are the acts of the United Shoe Machinery Corporation. This being the case, they are properly joined as defendants.

[8-10] *Is section 3 of the Clayton Act, so far as it applies to leases, unconstitutional?*

Counsel for defendants challenge the constitutionality of so much of section 3 of the Clayton Act as applies to leases. It has been earnestly and ably argued that a lease is no more commerce than insurance or manufacturing, and it is claimed, if not commerce, it cannot be interstate commerce. The diligence of the able counsel has not been rewarded by finding any authority which has determined that question, nor has the court been able to find any. In the argument many extreme illustrations were made. It is a well-settled rule that courts are slow to declare the acts of co-ordinate departments of the government void, and unless it appears beyond a reasonable doubt that the act is violative of the fundamental law of the United States the courts will uphold it. As stated by Mr. Justice Holmes in Interstate, etc., Railway Co. v. Massachusetts, 207 U. S. 79, 128 Sup. Ct. 26, 52 L. Ed. 111, 12 Ann. Cas. 555:

"It is not enough that a statute goes to the verge of constitutional power. We must be able to see clearly that it goes beyond that power. In case of a real doubt a law must be sustained."

This principle of law was settled at an early date by Chief Justice Marshall in Fletcher v. Peck, 10 U. S. (6 Cranch) 87, 3 L. Ed. 162. The fact that the question has never been before the courts, or that the power has never been exercised by Congress, is no proof that the Constitution does not authorize it. As stated by Mr. Justice Brewer in Re Debs, 158 U. S. 564, 591, 15 Sup. Ct. 900, 909 (39 L. Ed. 1092):

"Constitutional provisions do not change, but their operation extends to new matters as the modes of business and the habits of life of the people vary with each succeeding generation. The law of the common carrier is the same to-day as when transportation on land was by coach and wagon, and on water by canal boat and sailing vessel, yet in its actual operation it touches and regulates transportation by modes then unknown, the railroad train and the steamship. Just so it is with the grant to the national government of power over interstate commerce. The Constitution has not changed. The power is the same. But it operates to-day upon modes of interstate commerce unknown to the fathers, and it will operate with equal force upon any new modes of such commerce which the future may develop."

It may be conceded that every lease is not commerce, but that is not conclusive that none may be. Each case must be determined from

the peculiar facts shown to exist in that case. When a corporation with millions of capital, doing an annual business amounting to millions of dollars, sees proper to conduct its business by only leasing its chattels, instead of selling them, why is it not as much engaged in commerce as if it sold them outright? But, aside from that, cannot a person be engaged in interstate commerce, although, if its business is confined exclusively to its own state, it would not be engaged in commerce?

The act of Congress of June 25, 1910, c. 395, 36 Stat. 825 (Comp. St. 1913, §§ 8812–8819), commonly known as the "White Slave Act," makes it an offense to transport, or cause to be transported, in interstate or foreign commerce, any woman or girl, for the purpose of prostitution, or for other immoral purposes. In Hoke v. United States, 227 U. S. 308, 33 Sup. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905, arising under that Act, it was contended that the immoralities of their citizens can only be controlled by the states, and as women are not articles of commerce, there can be no reason for holding that, by reason of transporting them from one state to another, or furnishing means for such transportation, the acts can become interstate commerce. But the court unanimously held that, while it is true that women are not articles of commerce, if transportation is employed as a facility for their wrongs, Congress has the power to regulate or prohibit such acts under the commerce clause.

Acquiring an education would not ordinarily be commerce, but in International Text-Book Co. v. Pigg, 217 U. S. 91, 106, 30 Sup. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103, it was held that, as contracts between the company and its patrons involved the transportation from one state to another of books, apparatus, and papers, useful or necessary in the particular course of study the scholar is pursuing, the company was engaged in interstate commerce.

In Butler Bros. Shoe Co. v. United States Rubber Co., 156 Fed. 1 to 17, 84 C. C. A. 167, 183, the issue involved was whether a contract of factorage, under which the Rubber Company consigned to the Shoe Company goods from an Eastern state to Colorado, to be sold by the Shoe Company as a factor. Judge Sanborn, after a very thorough review of the authorities bearing on that subject, held:

"Nor is the fact that these contracts did not evidence sales of the goods determinative of this question. A sale is not the test of interstate commerce. All sales of sound articles of commerce, which necessitate the transportation of the goods sold from one state to another, are interstate commerce; but all interstate commerce is not sales of goods. Importation into one state from another is the indispensable element, the test, of interstate commerce; and every negotiation, contract, trade, and dealing between citizens of different states, which contemplates and causes such importation, whether it be of goods, persons, or information, is a transaction of interstate commerce."

From this it appears that every negotiation or dealing between citizens of different states which causes such importation is a transaction of interstate commerce. In Marienelli v. United Booking Offices (D. C.) 227 Fed. 165, it was held that booking performers for a theatrical circuit, which requires them to pass from state to state, taking

with them paraphernalia and stage properties, constitutes interstate commerce.

It is not necessary to cite the many authorities found in the books sustaining this conclusion, as they will be found collated in the opinions hereinbefore cited. It is sufficient to say that as new methods of transacting business are devised, if they are found to be in effect methods of carrying on commerce in any business, and the means for commercial transactions between the owner of the article on the one hand, and the person who wants to deal in it or use it in carrying on his business on the other hand, whether it be manufacturing, selling, trading, leasing, transportation, communication, or information, and it is sent or transported from one state to another, it is interstate commerce, and therefore, subject to be regulated by Congress under the commerce clause of the Constitution.

The bill charges that the machinery manufactured by the defendants is leased for the purpose of enabling the lessees to manufacture shoes; that they deal with over 1,500 shoe manufacturers in all parts of the United States, and, when the leases are made, the machinery is shipped by the defendants from the state of Massachusetts, the place of manufacture, to other states of the Union and to foreign countries. Upon these facts there can be no other conclusion than that the defendants are engaged in interstate commerce, and subject to be regulated by Congress. Whether it applies to leases made and sold in the same state, and not transported to another state, it is unnecessary to determine, on this motion, as the bill charges shipments to other states. By reference to the act under consideration, it will be noticed that, while section 1 defines the word "commerce" as used in the act, section 3 prohibits any person engaged in such commerce from doing the acts prescribed and enumerates them. The act is not limited to leases, and sales in interstate commerce, as is the Employers' Liability Act of April 22, 1908, c. 149, 35 Stat. 65 (Comp. St. 1913, §§ 8657–8665); but the language employed is like that used in the amendment of March 2, 1903, c. 976, 32 Stat. 943 (Comp. St. 1913, §§ 8613–8615), to the Safety Appliances Act (Act March 2, 1893, c. 196, 27 Stat. 531 [Comp. St. 1913, §§ 8605–8612]). This amendment had, prior to the enactment of the Clayton Act, been held to embrace all locomotives, cars, and vehicles used on a railway that is engaged in interstate commerce, and is not confined exclusively to vehicles engaged in interstate commerce. Southern Railway Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72, reaffirmed at the present term of the Supreme Court in Texas & Pacific R. Co. v. Rigsby, 241 U. S. 33, 36 Sup. Ct. 482, 60 L. Ed. 874. But whether this act should be so construed, and held to apply to the intrastate business as well as the interstate business of the defendants, in view of the fact that the defendants are charged to be engaged in interstate commerce, need not be determined now, as the question may never arise. Reference is made to it only for the reason that during the oral argument counsel for defendants stated that a very large part of the defendants' business is intrastate.

234 F.—10

[11] *Do the allegations in the complaint show a violation of section 3 of the Clayton Act?*

The act declares unlawful any lease, etc., where the price is fixed, or a discount or rebate upon such price is granted, under the condition, agreement, or understanding that the lessee or purchaser thereof is not to use or deal in the goods, etc., of a competitor of the lessor, or seller, where the effect of such lease, sale, or contract for sale, or such condition, agreement, or understanding, may be to substantially lessen competition, or tend to create a monopoly in any line of commerce. For the purpose of aiding in the construction of the act, counsel in their argument have read copious extracts from the reports and debates in Congress, while the act was under consideration. They have also furnished the court with copies of these reports and debates, and they have been carefully read; but so far as the construction of the act is concerned the court does not feel justified to consider them. It is only when the language of a statute is ambiguous that these sources can be referred to. If the language is clear and free from ambiguity, there is nothing for the courts to construe. United States v. Union Pacific Railroad, 91 U. S. 72, 23 L. Ed. 224; United States v. Trans-Missouri Freight Asso., 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; Dunlap v. United States, 173 U. S. 65, 19 Sup. Ct. 319, 43 L. Ed. 616; Maxwell v. Dow, 176 U. S. 581, 20 Sup. Ct. 448, 494, 44 L. Ed. 597; Dewey v. United States, 178 U. S. 510, 20 Sup. Ct. 981, 44 L. Ed. 1170; MacKenzie v. Hare, 239 U. S. 299, 307, 36 Sup. Ct. 106, 60 L. Ed. 297.

Aside from this, the record of the proceedings of the two Houses of Congress shows that section 3 of the Clayton Act, as finally enacted, differs materially from the section as passed by each House. The words "where the effect of such lease, sale, contract for sale, or such condition, agreement, or understanding may be to substantially lessen competition, or tend to create a monopoly in any line of commerce," are not found in either of the acts as passed by the House of Representatives or the Senate. Nor does the act as finally passed make the violation of that section a penal offense, although each of the houses had made such a provision. The act as finally passed was the result of the conference committees appointed by the two houses. What induced the conferees to make the changes, and Congress to adopt them in the final enactment of the statute, is unknown. Whether the speeches made, while the bill was pending, influenced the conference committees, and, if so, to what extent, is merely speculative, and for the courts to consider them in construing the act, as finally passed, might be misleading.

[12] A careful reading of this section of the act leaves no room for doubt as to what Congress intended. The language is plain, and the court is unable to find any ambiguity in it, which would make it necessary to resort, for aid in its construction, to any source outside the act itself. In plain and concise language it declares that it shall be unlawful for any person engaged in interstate commerce to lease, sell, or contract for sale of any commodity, whether patented or not, for use, consumption, or resale, and fix a price for, a discount from or rebate up-

on such price, on the condition, agreement, or understanding, that the lessees shall not purchase such articles from the competitors of the lessor or the seller, and then is added:

"If the effect of such an agreement, or understanding, may be to lessen competition, or tend to create a monopoly."

That the leases made by the defendants, as shown by the extracts attached to the complaint as exhibits, provide for rebates on condition that the lessee shall only use the machines and materials manufactured and dealt in by the defendants, and forbids the use of machines purchased from other manufacturers, under penalty of having the leases canceled and machines taken from them by defendants, is beyond question. But it is claimed that there is nothing in the leases whereby the lessees covenant or bind themselves not to use any machines manufactured by other parties, or purchase materials which are dealt in by the defendants, from others. This is true, but as the lessors retained the right, in case any other machines are used in the manufacture of shoes than those manufactured by the defendants, of canceling the leases and removing the leased machines, and further provide for a rebate to those who comply with these terms, which those using other machines or material do not receive, there is an implied promise on the part of the lessees not to violate these conditions of the leases, or suffer the penalties set out in the leases. It is charged in the bill:

"In nearly all cases, however, they [lessees] are deterred from doing so by the said 'tying clauses,' and by fear of the serious financial consequences that would follow their violation. * * * Some indispensable machines can be obtained only from the defendants; for example, the stitch indenter and burnisher."

Exhibit 5 shows that the machine therein mentioned is protected by letters patent of the United States and provides that:

"The lessee is hereby licensed under letters patent of the United States No. 849,245, dated April 2, 1907, to manufacture by the use of the principal machinery hereby leased, during the continuance in force of this lease and license, the patented insoles covered by said letters patent, and to use such patented insoles so made by the lessee in the manufacture of welted or turned boots, shoes, or other footwear, which have been or are being manufactured as provided in article 5 hereof."

The acceptance of a deed poll containing a provision that the grantee assumes payment of a certain mortgage or lien on the premises conveyed binds the grantee to the performance of the terms, and an action, in some states at law, while in others in equity, will lie on the implied promise. Keller v. Ashford, 133 U. S. 610, 10 Sup. Ct. 494, 33 L. Ed. 667; Willard v. Wood, 164 U. S. 502, 17 Sup. Ct. 176, 41 L. Ed. 531; Fiske v. Tolman, 124 Mass. 254, 26 Am. Rep. 659; Locke v. Homer, 131 Mass. 93, 41 Am. Rep. 199; Johnson v. Muzzy, 45 Vt. 419, 12 Am. Rep. 214; Patton v. Adkins, 42 Ark. 197; Dismukes v. Halpern, 47 Ark. 317, 1 S. W. 554; Hand v. Kennedy, 83 N. Y. 149; Bowen v. Beck, 94 N. Y. 86, 46 Am. Rep. 124; Finley v. Simpson, 22 N. J. Law, 311, 53 Am. Dec. 252; Crowell v. St. Barnabas Hospital, 27 N. J. Eq. 650; Maule v. Weaver, 7 Pa. 329. The right to impose a

heavy penalty for doing certain things is just as effective to prevent them as a covenant not to do them.

It is therefore unnecessary that the lessees should bind themselves to these conditions or agreements by covenants. It is sufficient if the natural and inevitable effect of the leases, accepted by them, leads to the same result as if they had in express terms bound themselves not to use any other machines or materials than those manufactured or dealt in by the defendants. But, to remove any doubt upon the subject, Congress, out of abundant caution, added the words "or understanding" after the words "contracts or agreements." The word "understanding," as defined by lexicographers, includes mental discernment, comprehension, clear knowledge. Professor March, in his valuable Thesaurus Dictionary, defines it as equivalent to "comprehension."

Counsel contend that "understanding" is equivalent to "agreement," except that it imports that it is oral. The court cannot adopt this definition. In its opinion it means something more. It means an implied agreement, resulting from the expressed terms of the agreement, whether written or oral, or where the law from certain acts of the parties implies an agreement to do a certain act. A right to recover on a quantum meruit is based upon an understanding or implied agreement to pay for services rendered for one's benefit, although there is no express agreement to pay therefor.

Can there be any doubt that these clauses in the leases are understood by the lessees to mean that by using no other machines than those of the defendants they are relieved of certain royalties, otherwise exacted for the use of the defendants' machines? See Exhibits 9, 10, 11, and 12. And can there be any doubt but that, if the lessees use the defendants' lasting machines for shoes welted on machines made by other manufacturers, or fail to use exclusively defendants' machines for lasting shoes, or fail to purchase from the defendants exclusively all duplicate parts, extras, and devices of every kind, needed or used in operating, repairing, or renewing the lasting machinery, or fail to use exclusively the auxiliary machinery of the lessor in the manufacture or preparation of insoles licensed under letters patent No. 849,-245, or fail to buy any additional machines needed in their shoe factory, which can be leased from the lessor, that under the terms of the leases set out in the Exhibits 1, 3, 4, 5, and 6, all of the leases can be canceled and the lessees be deprived of the use of them and be compelled to pay certain royalties, which otherwise they would not have to pay? Exhibit 9 expressly authorizes the lessor to terminate all leases for these breaches, although the lessee is bound by them for 17 years from the date of the lease, whether the patents, if there be any, have expired or are still in force.

Can it be doubted that these provisions are not only within the spirit but the letter of the statute? What is the natural, direct, and necessary effect of these conditions? There can be but one answer to this: To compel the lessees to use defendants' machinery and material, regardless of whether the terms granted by the defendants are as favor-

able as can be obtained from other manufacturers of some of the machines or dealers in some of the materials.

In addition, it is charged that by reason of these leases there is no market for any one inclined to manufacture these or some of these machines, and therefore all are deterred from engaging in their manufacture, as, there being no market for them, financial failure is bound to result from the attempt. Such a condition of affairs clearly tends to substantially lessen competition, and create, in favor of the defendants, a monopoly in that line of commerce.

In addition, it is charged in the bill that the New Jersey Company acquired and still owns the capital stock of 56 other concerns, at one time engaged in the manufacture and selling and leasing of some form of shoe machinery or supplies. The bill alleges:

"Thus the control of a complete line of 'principal' and 'auxiliary' machinery used in the bottoming of shoes became vested in one establishment. Before this no one company could supply such a line, nor can any company do so now outside the defendants."

The reason other manufacturers do not engage in making all the machines as the defendants do are not stated as specifically as they might be. Whether it is due to the fact that many of these machines, or some of them, are protected by letters patent, or what other reason there may be, might well be stated more explicitly, in order that the court may determine whether they are sufficient to sustain the conclusions of the pleader, who during the argument stated that some of these machines leased by the defendants are protected by letters patent and for that reason cannot be made by others. The only reference to patented machines is in Exhibit 5, and refers to the Goodyear insole machines. But under the present liberal practice this is not sufficient to sustain a motion to dismiss, although it would be better pleading to set out more fully the reasons why other parties cannot manufacture all these machines. The effect is shown by Exhibit 13.

[13] *Is the complaint defective because it does not charge that the acts of the defendants were unduly and improperly exercised?*

It is claimed that in view of the construction of the Sherman Act in the Standard Oil and Tobacco Cases, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, and 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, it is not sufficient to charge acts which may result in creating a monopoly, unless further shown that the actions of the parties were "unduly and improperly exercised." There can be no doubt that upon well-established principles of law the courts presume that Congress, when legislating upon a subject included in previous statutes, uses the same language found in the previous statute and if it had prior to the enactment of the later act been construed by the courts, especially the Supreme Court, it intended to adopt that construction as a part of the new act.

But is the language used in the Clayton Act, even if not identical, so similar to that used in the Sherman Act, construed in those cases, as to make that rule applicable? By referring to sections 1 and 2 of the Sherman Act (Comp. St. 1913, §§ 8820, 8821), it will be seen that Congress used merely generic words, without defining what spe-

cific acts shall constitute restraint of trade or commerce, or a monopoly. The Chief Justice, in delivering the opinion of the court, said:

"The merely generic enumeration which the statute makes of the acts to which it refers and the absence of any definition of 'restraint of trade' as used in the statute leaves room for but one conclusion, which is that it was expressly designed not to unduly limit the application of the act by precise definitions, but while clearly fixing a standard; that is, by defining ulterior boundaries which could not be transgressed with impunity, to leave it to be determined by the light of reason, guided by the principles of law and the duty to apply and enforce the public policy embodied in the statute, in every given case, whether any particular act or contract was within the contemplation of the statute."

On the other hand, the act now under consideration, instead of using the generic words of the Sherman Act, in plain and unequivocable language states what acts shall be unlawful, if they "substantially lessen competition or tend to create a monopoly." This being the case, the presumption is, not that Congress intended that the construction of the Sherman Act should control, but, on the contrary, that it should not control. Had Congress intended that the construction placed upon the Sherman Anti-Trust Act in those cases should apply to the Clayton Act, it would have used the same or like generic words, instead of defining what acts shall be unlawful, if the natural result of such acts tends to substantially lessen competition or create a monopoly in any line of commerce.

It will be noticed that in this act there is nothing said of combinations or conspiracies, nor that the parties complained of are monopolizing or attempting to monopolize any part of the commerce among the several states, as was required in the Sherman Act. This applies to the many cases cited by counsel for defendants on this point, all of which arose under the Sherman Act. Evidently Congress was not satisfied to only prohibit actual lessening of competition, or monopolizing, but to make it unlawful for any person to do those acts, which may put it in his power to do so.

For these reasons, in the opinion of the court, all that is necessary to state a cause of action under the Clayton Act is to charge that the defendants committed the acts prohibited by the statute and that they tend to substantially lessen competition or create a monopoly in interstate commerce.

So far as the wisdom of the act is concerned the courts cannot question it. Congress alone can determine that. Veazie Bank v. Fenno, 75 U. S. (8 Wall.) 533, 19 L. Ed. 482; United States v. Union Pacific R. Co., 91 U. S. 72, 23 L. Ed. 224; Angle v. Chicago, etc., R. Co., 151 U. S. 1, 14 Sup. Ct. 240, 38 L. Ed. 55; Hunter v. Pittsburgh, 207 U. S. 161, 28 Sup. Ct. 40, 52 L. Ed. 151. As stated in the Employers' Liability Cases, 207 U. S. 463, 492 (28 Sup. Ct. 141, 143, 52 L. Ed. 297):

"In testing constitutionality of an act of Congress this court confines itself to the power of Congress to pass the act, and may not consider any real or imaginary evils arising from its execution."

In Standard Sanitary Mfg. Co. v. United States, 226 U. S. 20, 49, 33 Sup. Ct. 9, 15 (57 L. Ed. 107), Mr. Justice McKenna, speaking for the court said:

"The law is its own measure of right and wrong, of what it permits, or forbids, and the judgment of the courts cannot be set up against it in a supposed accommodation of its policy with the good intentions of parties, and it may be, of some good results."

Or as has been so tersely expressed by Judge Dyer, when this case was before him ([D. C.] 227 Fed. 507, 511):

"If the course adopted by the defendants has the effect to stifle competition and create a monopoly within the law, then the law should be enforced, even if it resulted in going back to the awl and wooden peg."

*Are the provisions in the leases requiring lessees to use lasting machinery to its full capacity, and in case the lessee shall have more machines adapted for doing the same work than is necessary, for a period of 12 consecutive months, the lessor can remove the machines not necessary, unreasonable?*

These provisions are found in Exhibits 2 and 7. The court is unable to see anything unreasonable in these provisions. The only compensation for the use of the machines provided in the leases is the royalty upon the shoes manufactured on them. To permit the lessees to retain more machines than are necessary for the manufacture of his product would result in the lessors receiving no compensation therefor, consequently no return on the investment. As these provisions are only to be enforced, if the machines are not used to their capacity for the period of 12 consecutive months, the court is unable to say that they are in violation of any provisions of the Clayton Act, or can in any way tend to substantially lessen competition or create a monopoly.

*Is the act retroactive or retrospective, so as to apply as to leases entered into before the enactment of the act?*

That question was fully discussed by counsel, but in the opinion of the court it is unnecessary to determine it on this motion, as on the final hearing there may be no such leases in force. If there should be, it will be time enough to determine that question then.

*Is the act unconstitutional in attempting to apply it to patents previously granted?*

Neither in the oral argument, nor in the elaborate briefs filed by counsel, was this ground of the motion urged. It may therefore be assumed that it has been abandoned by the defendants. But in any event the court can conceive of no reason why Congress cannot restrict the rights of patentees, if in its opinion they are used in a manner resulting in oppressing the public. A patent is merely a privilege granted to inventors by Congress, and whenever that privilege is abused or is found to be exercised in a manner contrary to the public policy of the government, Congress certainly has the power to enact laws which will prevent such an abuse. Whether it can deprive a patentee of all the privileges granted by the patent before its expiration is a question which cannot arise under this act.

[14] Something was said in the oral argument about an impairment of contracts, but there is nothing in the Constitution of the United States which prohibits Congress from enacting legislation impairing the obligations of contracts. Article 1, § 10, applies to the states only,

and is not a limitation of the powers of Congress. Legal Tender Cases, 79 U. S. (12 Wall.) 457, 547, 20 L. Ed. 287, et seq.; Mitchell v. Clark, 110 U. S. 633, 643, 4 Sup. Ct. 170, 312, 28 L. Ed. 279; Evans-Snider-Buel Co. v. McFadden, 105 Fed. 293, 44 C. C. A. 494, 58 L. R. A. 900, affirmed McFaddin v. Evans-Snider-Buel Co., 185 U. S. 505, 22 Sup. Ct. 758, 46 L. Ed. 1012.

This disposes of all the issues raised by the motion to dismiss, which is overruled.